GRISWOLD INN, INC., ET AL. *v.* STATE OF CONNECTICUT ET AL.

BOGDANSKI, PETERS, HEALEY, ARMENTANO and WRIGHT, Js.

Argued January 9—decision released April 21, 1981

*Charles M. Tighe,* for the plaintiffs.

*Robert F. Vacchelli,* assistant attorney general, with whom, on the brief, were *Carl R. Ajello,* attorney general, and *Richard M. Sheridan,* assistant attorney general, for the defendant.

*Margaret Hayman* and *Martha Stone* filed a brief as amicae curiae.

BOGDANSKI, J.   In this case the plaintiffs, Griswold Inn, Inc., et al. sought to have the Superior Court declare unconstitutional General Statutes §§ 30-91, 30-74, and 30-77 insofar as they prohibit sale of alcoholic liquor on Good Friday.   They further sought to enjoin the defendants from enforcing those statutes.   Pursuant to Practice Book §§ 3133 and 3134, the case is before this court on reservation.

The facts relevant to a determination of the issues have been agreed upon by the parties. The pertinent stipulated facts are as follows:   "Good Friday is an annual day of holiness of the Christian religious faith upon which those professing that faith commemorate the death by crucifixion of Jesus Christ, the founding inspiration of that faith, whose death is by them believed to constitute an act of atonement for human transgressions against the commandments of a Supreme Being acknowledged by that faith.

"Easter Day is an annual holy day of the Christian religious faith upon which those professing that faith commemorate the resurrection of Jesus Christ.

"The resurrection of Jesus Christ is believed by those professing the Christian faith to have occurred on a Sunday, and his death by crucifixion is believed to have occurred on the Friday next preceding that Sunday.

"After a period of disagreement among early Christians concerning the proper day of the year upon which Christ's resurrection should be annually observed, the method of reckoning the date thereof was established at a gathering of Christian prelates known as the Council of Nicea in 325 A.D.

"In accordance with the determination made at the Council of Nicea, Easter Day is to be observed annually by the churches of the Christian religious faith on the first Sunday after the full moon which happens upon or next after the vernal equinox in each year, and the 'full moon' for this purpose is the 14th day of a lunar month reckoned according to an ancient ecclesiastical computation.

"Among the churches of the Christian religious faith, Easter Day is regarded as a religious festival of great rejoicing, and Good Friday is regarded as a religious day of mourning and repentence, and Good Friday is observed always on the Friday next before Easter Day.

"The date prescribed for observing Easter Day pursuant to the method determined at the Council of Nicea, and therefore the date prescribed for observing Good Friday, are calculated by Roman Catholic and Protestant churches of the Christian religious faith according to the Gregorian Calendar, while

those dates are calculated by the Eastern Orthodox church of that faith according to the Julian Calendar, and, as a result, these days are not usually observed by Eastern Orthodox churches on the same dates as they are observed by Roman Catholic and Protestant churches.

"Regular religious observance of Good Friday began early in the Christian era among Christians in Jerusalem and continues to the present time.

"The early Roman Catholic, Eastern Orthodox, Anglican, and other Protestant churches of the Christian religious faith prescribed church attendance, abstention from all secular business, and fasting as the proper practices for observance of Good Friday by those professing the Christian religious faith.

"In the early 17th century, Christians dissenting from rites and doctrines of the Protestant church established in England refused to observe Good Friday as a special holy day of fasting. These dissenters, known as Puritans, although refusing to observe regularly appointed days of holiness, including Good Friday, according to the rites prescribed by the Anglican established church, did observe days of fasting on particular appointed occasions, another custom of the times. Many of these Puritans left England to escape persecution for their religious beliefs and were [the] original [European] settlers in Connecticut as well as other parts of the New World. These Christian settlers of the New World continued to resist the establishment of Good Friday as a day of special religious observance, but appointed and observed occasional days of fast usually upon the appearance of public danger or other calamity.

"The celebration of an annual spring fast was first conceived and established in Connecticut by these settlers, the appointment of the date was left to civil authorities dating back to at least 1659 and was sometimes kept as late as June. The Roman Catholic church and the Anglican church continue to regard Good Friday as a fast day, although both churches have created alternative methods of observance. This annual spring fast day was appointed and observed to seek divine favor upon the undertakings of the coming year and generally carried a somber theme of prospective hope for the ensuing year especially in regard to the planting of the fields.

"It happened that the annual spring fast day in colonial Connecticut came to be appointed generally on a Wednesday or Thursday in the spring and, immediately prior to 1795, was frequently appointed for a day in Easter week which, among members of the Anglican church in Connecticut, was regarded as a period of rejoicing; an annual thanksgiving day feast day came to be celebrated in the fall.

"Connecticut Governor Huntington in 1795, in order to avoid conflict with Easter week and court and legislative recesses, appointed the annual fast day on Good Friday as an experiment, the day which the Anglican church in New England, as in England, was accustomed to observe as a fast day, and since 1797, the annual fast day has always been appointed on Good Friday without objection. . . . On the day proclaimed as a day of prayer and fasting by the Governor, state and municipal offices, including public libraries, schools, banks and some industries, are closed and neither the General Assembly nor state or federal courts conduct bus-

iness on that day, but many industrial and commercial enterprises, including restaurants and other retail stores, conduct business.

"The consumption of alcohol in immoderate quantities [impairs physical and mental skills in many people, and] persons who are intoxicated have a much higher chance of being involved in or causing highway and recreational accidents resulting in death or serious injury.

"The plaintiffs desire to sell and serve alcoholic liquor on Good Friday. [They] are prohibited from selling and serving alcoholic liquor on Good Friday by reason of the risk of prosecution, conviction and punishment pursuant to said laws of the state of Connecticut, and the consequent loss of their privilege to sell and serve alcoholic liquor under the provisions of Chapter 545 of the General Statutes.

"As a result of the intimidating effect upon them of said statutes of the state of Connecticut and their inability to offer for sale and to sell and serve alcoholic liquor lawfully on Good Friday, the plaintiffs have suffered and will continue to suffer the loss of revenues, income and profits from the sale [of food and alcoholic liquor and] the letting of rooms in their businesses on each such day . . ." and the weekend following such day.

The pertinent questions reserved for this court are: (a) "Are § 30-91 of the General Statutes, insofar as it declares unlawful, and §§ 30-74 and 30-77 of the General Statutes, insofar as they prohibit, the sale of alcoholic liquor on Good Friday, laws made in violation of article seven of the constitution of the state of Connecticut 1965 in that said laws compel the plaintiffs to join or support, or

be classed or associated with, a congregation, church or religious association? (b) Are § 30-91 of the General Statutes, insofar as it declares unlawful, and §§ 30-74 and 30-77 of the General Statutes, insofar as they prohibit, the sale of alcoholic liquor on Good Friday, laws made in violation of the first and fourteenth amendments of the constitution of the United States in that they are laws made by the state of Connecticut respecting an establishment of religion?"

Because we conclude that §§ 30-91, 30-74 and 30-77 are unconstitutional in that they prohibit the sale of alcoholic beverages on Good Friday, in violation of article seventh of the constitution of the state of Connecticut, and the first and fourteenth amendments to the United States constitution, we need not resolve the other questions presented.[1]

This court, in *Snyder* v. *Newtown,* 147 Conn. 374, 385, 161 A.2d 770 (1960), appeal dismissed, 365 U.S. 299, 81 S. Ct. 692, 5 L. Ed. 2d 688 (1961), construed article seventh, § 1, of the Connecticut constitution of 1955[2] and held that its purpose was to erect "a

[1] These issues involve alleged violations of § 10 of article first of the Connecticut constitution and the fourteenth amendment to the United States constitution.

[2] "[Conn. Const. art. 7 (1955)] Sec. 1. It being the duty of all men to worship the Supreme Being, the Great Creator and Preserver of the Universe, and their right to render that worship, in the mode most consistent with the dictates of their consciences; no person shall by law be compelled to join or support, nor be classed with, or associated to, any congregation, church or religious association. But every person now belonging to such congregation, church, or religious association shall remain a member thereof until he shall have separated himself therefrom, in the manner hereinafter provided. And each and every society or denomination of Christians in this state, shall have and enjoy the same and equal powers, rights and privileges; and shall have power and authority to support and maintain the ministers or teachers of their respective denominations, and to build and repair houses for public worship, by a tax on the

wall of separation between Church and State," and thus had a purpose similar to that of the Establishment Clause of the first amendment of the United States constitution.[3]

The United States Supreme Court sets forth a three-part test to determine whether a law violates the Establishment Clause. "[T]o pass muster under the Establishment Clause the law in question, first, must reflect a clearly secular legislative purpose, second, must have a primary effect that neither advances nor inhibits religion, and, third, must avoid excessive governmental entanglement with religion." (Citations omitted.) *Committee for*

members of any such society only, to be laid by a major vote of the legal voters assembled at any society meeting, warned and held according to law, or in any other manner." Article seventh of the present 1965 constitution no longer holds that it is "the duty of all men to worship the Supreme Being" but that it is "the right of all men to worship the Supreme Being."

"[Conn. Const. art. 7 (1965)] It being the right of all mem to worship the Supreme Being, the Great Creator and Preserver of the Universe, and to render that worship in a mode consistent with the dictates of their consciences, no person shall by law be compelled to join or support, nor be classed or associated with, and congregation, church or religious association. No preference shall be given by law to any religious society or denomination in the state. Each shall have and enjoy the same and equal powers, rights and privileges, and may support and maintain the ministers or teachers of its society or denomination, and may build and repair houses for public worship." This change shows a greater awareness of religious freedom, and of the separation of church and state.

[3] "[U.S. Const. amend. 1] Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble; and to petition the Government for a redress of grievances."

Article seventh's language even more than the federal provision condemns any law which gives "preference" to one religious society and assures that no person "shall . . . be compelled to . . . support . . . or be associated with" any religious group but can "worship in a mode consistent with the dictates of their consciences." The state provision is thus more comprehensive than the federal provision.

*Public Education* v. *Nyquist,* 413 U.S. 756, 772–73, 93 S. Ct. 2955, 37 L. Ed. 2d 948 (1973). If a legislative enactment fails any one part of the test, it must fall. *Stone* v. *Graham,* 449 U.S. 39, 40–41, 101 S. Ct. 192, 66 L. Ed. 2d 199, reh. denied, 449 U.S. 1104, 101 S. Ct. 904, 66 L. Ed. 2d 832 (1980).

## I

### No Clear Secular Purpose Justifies Prohibition of Liquor Sales on Good Friday

The defendants contend that the purpose of the legislation is to prohibit the sale of liquor on a holiday which enjoys statewide celebration. A reading of § 30-91 shows that that could not be the legislative intent. Good Friday is the only day of the year when liquor cannot be obtained in restaurants. Had the legislature been concerned with celebrating a secular holiday, it would have prohibited the sale of alcohol on other holidays. Given the traditional Christian significance of Good Friday and Christian exhortation to fast and abstain on that day in mourning for the death of Christ, the singling out of Good Friday reveals that there is no clear secular purpose which justifies the prohibition of liquor sales on this day.

The conclusion that a religious purpose stands behind this prohibition is not negated by the fact that Connecticut governors regularly proclaim a day of fasting and prayer pursuant to General Statutes § 1-4 on Good Friday. Good Friday is conspicuously absent from § 1-4's list of civil holidays. It becomes a holiday only by special proclamation of the governor. This proclamation initially set the date for the Puritan's day of fasting and prayer. Although the Puritans rejected Anglican observance

of Good Friday, their spring fast day was clearly a religious day of holiness. Moreover, the passage of time has not converted Good Friday into a secular holiday or freed it of its clearly religious origins. Although recent proclamations may not have been as explicitly Christian as those in earlier years, they nonetheless remain religious in tone. Despite gubernatorial proclamations, there is no doubt that Good Friday lacks widespread public popularity or acceptance as a secular holiday. Indeed, a California court has found that Good Friday is "a wholly religious day." *Mandel* v. *Hodges,* 54 Cal. App. 3d 596, 612, 127 Cal. Rptr. 244 (1976).

This court is not bound to accept at face value the state's claim that the purpose of the governor's proclamation and the Good Friday prohibition are the celebration of a secular holiday. See *Stone* v. *Graham,* supra, where the United States Supreme Court, rejecting the avowed secular purpose of a Kentucky statute requiring the posting of a copy of the Ten Commandments in public school classroom, found the provision's purpose "plainly religious in nature."

In a case similar to the present one, a California court was confronted with a governor's proclamation making the hours of twelve noon to 3 p.m. on Good Friday a public holiday for state employees. The court flatly rejected the state's claim that the purpose of the order was to provide a period of rest and relaxation from work for state employees; it concluded that a state statute promoting observance of Good Friday could not plausibly serve a secular purpose, given the continued religious significance of that day. *Mandel* v. *Hodges,* supra,

612. For similar reasons, the conclusion that the Good Friday prohibition has a religious purpose is compelled here.

## II

### The Primary Effect of the Good Friday Prohibition is to Advance Religion

The second prong of the test for satisfying the Establishment Clause is that the law have "a primary effect that neither advances nor inhibits religion." *Committee for Public Education* v. *Nyquist,* supra, 773. Clearly § 30-91's Good Friday liquor prohibition advances religion in general and in particular the Christian religion by preventing the sale and drinking of liquor in restaurants on only one day a year, Good Friday, a religious holiday on which Christians traditionally fast and mourn the death of Christ. The impermissible effects of the law are twofold. First, the very existence of that legal prohibition on this major Christian religious holiday gives the state's clear stamp of approval both to the Christian rites and practices observed on that day and to Christianity in general. It indicates a bias in favor of Protestant and Catholic forms of Christianity over Eastern Orthodox, nonChristian and nonreligious practices and beliefs. It has long been recognized that because of the authority and influence of the state, such state approval of or identification with the tenets or practices of a particular religion clearly promotes that religion in violation of the Establishment Clause. In *Engel* v. *Vitale,* 370 U.S. 421, 431, 82 S. Ct. 1261, 8 L. Ed. 2d 601 (1962), the United States Supreme Court noted: "When the power, prestige and financial support of government is placed behind a particular religious belief, the indirect coercive

pressure upon religious minorities to conform to the prevailing officially approved religion is plain." Accordingly, that court invalidated a New York school policy requiring recitation of a nondenominational prayer by public school children at the start of each day even though participation was voluntary. Id., 430, 433.

Second, beyond merely indicating state approval of Christian Good Friday rites, the law imposes their observance on Connecticut citizens, Christian and nonChristian alike.  Permittees, such as the plaintiffs herein, are subject to revocation of their liquor licenses, a fine or imprisonment if liquor is served on that day.

Thus, the primary effect of the Good Friday prohibition is an endorsement of the Protestant and Catholic faiths.  This effect cannot be characterized as an indirect or remote benefit to religion, which might be permissible under the Establishment Clause. *Committee for Public Education* v. *Nyquist*, supra, 771.

The defendants further argue that the primary effect of the law is to promote traffic safety and encourage safety in recreational activities on a day celebrated as a statewide holiday.  They argue that Good Friday presents special highway safety and recreational problems, since after a dreary cold winter, it is for many the first time when weather permits outdoor recreational activity.  The facts agreed upon by the parties do not stipulate that Good Friday presents any such special problems. Any problem of alcohol abuse on this day is at most speculative and incidental to the primary religious impact.

## III

### THE GOOD FRIDAY PROHIBITION REQUIRES EXCESSIVE AND THUS IMPERMISSIBLE ENTANGLEMENT OF GOVERNMENT WITH RELIGION

Connecticut's Good Friday legislation results in two sorts of entanglement between religion and state which, because excessive, require its invalidation under the Establishment Clause. First, the statute requires an impermissible degree of inspection or monitoring of religious institutions or practices, so called administrative entanglement since the state must monitor the sale of alcohol on Good Friday. *Lemon* v. *Kurtzman,* 403 U.S. 602, 619–20, 91 S. Ct. 2105, 29 L. Ed. 2d 745 (1971). The state and all liquor licensees affected by General Statutes § 30-91 (a) and (b) must determine the actual date of Good Friday on which the sale of liquor is prohibited by reference to ecclesiastical calendars. In addition, through its liquor control commission, charged with liquor law enforcement (see § 30-6), the state must in effect monitor and enforce observance of a religious holiday by permittees in order to enforce General Statutes § 30-91 (a) and (b).

Second, the Good Friday prohibition engenders political entanglement with religion by creating political divisions and debate along religious lines. *Committee for Public Education* v. *Nyquist,* supra, 796–97. Clearly, legislative and popular debates over the propriety of such a prohibition encourage division along religious lines, with religious institutions and those practicing Christians among Connecticut's citizens whose convictions require religious observance of Good Friday pitted against nonChristians and nonreligious persons. It was

this sort of "fragmentation . . . along religious lines [which was] one of the principal evils against which the Establishment Clause was intended to protect." *Meek* v. *Pittenger,* 421 U.S. 349, 372, 95 S. Ct. 1753, 44 L. Ed. 2d 217 (1975). Thus, Connecticut's Good Friday prohibition also fails the third aspect of the test. See also *Mandel* v. *Hodges,* supra, 615.

Because the Good Friday prohibitive legislation satisfies none of the three prongs of the test enunciated by the United States Supreme Court for determining when a state has overstepped the limits of neutrality in religious matters, that enactment clearly violates the Establishment Clause.

Accordingly, we answer question (a) yes and question (b) yes.

No costs will be taxed in this court to any party.

In this opinion PETERS, ARMENTANO and WRIGHT, Js., concurred.

ARTHUR H. HEALEY, J. (concurring). I concur in the result. The opinion correctly points out that the United States Supreme Court has devised a three part test to determine whether a challenged statute violates the Establishment Clause; *Stone* v. *Graham,* 449 U.S. 39, 40, 101 S. Ct. 192, 66 L. Ed. 2d 199, reh. denied, 449 U.S. 1104, 101 S. Ct. 904, 66 L. Ed. 2d 832 (1980); *Committee for Public Education* v. *Nyquist,* 413 U.S. 756, 772–73, 93 S. Ct. 2955, 37 L. Ed. 2d 948 (1973); *Lemon* v. *Kurtzman,* 403 U.S. 602, 612–13, 91 S. Ct. 2105, 29 L. Ed. 2d 745 (1971); and that if that statute violates any one of these three principles it must be struck down. *Stone* v. *Graham,* supra, 40–41. Having concluded in Part

I of the opinion that the statutes involved here are to be stricken as violative of the Establishment Clause because they do not have a "clearly secular legislative purpose," thus violating one of the three principles, I see no necessity, legal or factual, to go on and discuss whether they also violate either or both of the other two principles, as set out in Parts II and III of the opinion. The result reached in the opinion is authoritatively supported by the persuasive analysis in Part I. I am, however, unable to subscribe to the analysis in Parts II and III.