## CHRISTINE A. COLOGNE ET AL. *v.* WESTFARMS ASSOCIATES ET AL.

SUPERIOR COURT      JUDICIAL DISTRICT OF      FILE No. 260773
HARTFORD-NEW BRITAIN AT HARTFORD .

Memorandum filed January 4, 1982

*Martha Stone, Helen Z. Pearl* and *Martin B. Margulies* of the New York and Massachusetts bars, for the plaintiffs.

*Schatz, Schatz, Ribicoff & Kotkin,* for the defendants.

BIELUCH, J.    The plaintiffs seek to enjoin the defendants from prohibiting the use by the plaintiffs of a common area in the defendants' shopping mall for the solicitation of signatures supporting a proposed "equal rights" amendment (hereinafter ERA) to the constitution of the United States.  By agreement of the parties the application for a temporary injunction was withdrawn in favor of an expedited hearing on a permanent injunction.

The plaintiffs are Christine A. Cologne (hereinafter Cologne), president of the Greater Hartford Area Chapter of the National Organization for Women (hereinafter Hartford NOW) and the Connecticut National Organization for Women (hereinafter Connecticut NOW). Cologne is responsible for the coordination of Hartford NOW's participation in the national ERA campaign sponsored by the National Organization for Women (hereinafter NOW). Connecticut NOW has approximately 3000 members throughout the state, including Cologne, and is also participating in the national campaign for the adoption of the ERA, which succinctly reads: "Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex."

The named defendant, Westfarms Associates (hereinafter Westfarms), is a partnership consisting of several individual defendants. It owns and operates a shopping center, known as Westfarms Mall, located partly in West Hartford and partly in Farmington, Connecticut. Westfarms has hired the Taubman Company, of Troy, Michigan, to be its operating agent for the management of the shopping center. The policies and procedures formulated by the Taubman Company for the operation of the mall are the policies and procedures of Westfarms. John E. Wagner, an employee of the Taubman Company, was the center manager of Westfarms Mall at all times relevant to this action, and in such capacity was responsible for carrying out the policies and procedures established by his employer for the maintenance, promotional activities, preservation and security of the building and surrounding parking lots.

Westfarms Mall is a totally enclosed and climate controlled shopping center open to the public for retail business with those who maintain stores on the premises. The purpose of its development was to pro-

vide a building for the leasing and operation of retail stores and for the encouragement of retail sales in the shopping center for the mutual benefit of the owners and occupants. The mall has five entrances and consists of approximately one hundred thirty-two retail establishments, three cinemas and fourteen restaurants. In addition, the mall is secured by three major department stores as anchors at two ends and at the center of one side. Those three department stores are a part of the mall complex and shops even though the portions of the mall building housing them are separately owned by them and have separate exterior entrances. The policies and procedures adopted for the operation of the mall are not binding upon those department stores. The entire parking area is considered common area, although the major portion of the parking area is owned in fee by the three department stores, which have granted cross-easements to the defendants.

The mall is open limited hours. When the retail and department stores close, entry is blocked to all areas except to the restaurants and movie theaters. All entrances are closed from approximately 1:00 a.m. to 8:00 a.m. Employment at the mall is normally provided to approximately 2000 full and part-time employees. This increases to about 3000 during the peak months of November and December. Approximately eleven full-time and four part-time security officers are employed by the defendants. They are uniformed and have police powers within the mall. Those officers are charged with policing the mall and with enforcing the policy promulgated for the premises and in issue before the court. They patrol the building and the parking lots in order to maintain peace and order. Police protection is also provided by the town of Farmington by routine inspections on a daily basis.

Westfarms Mall is the largest shopping center in Connecticut, and one of the largest in New England. Its estimated annual sales for 1980 totaled $73,000,000, not including sales receipts for the three major department stores, which are not available. The mall substantially predominates in the region as to volume of sales and number of patrons. By current estimates approximately 5000 persons visit the mall daily and 10,000 to 20,000 on Saturday or Sunday. Five bus lines provide public transportation to the mall on a regular basis.

The total area of the mall is approximately 96 acres, one-half of which is owned by the defendants and the remainder of which by the three department stores. The mall building covers about 24 acres of the land and contains about 1,000,000 square feet. Gross leasable area of Westfarms Mall presently is 407,200 square feet, in addition to approximately 500,000 square feet owned by the three department stores. The internal common areas of the shopping mall, including walkways and open courtyard areas, contain 84,000 square feet.

There are no public streets or sidewalks within the mall complex or adjacent to the building. The parking areas are not public streets and are not available for parades, public meetings or demonstrations.

The mall is constructed so that all retail establishments are enclosed in a two-level structure, with two major department stores on the north and south ends and a third one to the east of the center or grand court. On the first level, at the north and south ends of the shopping center, are two courts containing 15,600 square feet each. Pedestrian walkways begin at the two end department stores and lead to an open center court, called the grand court. On the second level, the walkways lead to a balcony area that overlooks the grand court. All retail stores leased from the defendants border these walkways and are

entered from them. While the three department stores have their own private exterior entranceways, their interior entrances in the mall are from these same bordering walkways.

The grand court, containing approximately 14,000 square feet, is three steps lower than the common walkways and is separated from the immediate vicinity of the stores by the common walkways which form a ring around the court. Four-foot barriers rise from the floor of the grand court and are approximately two feet from the floor of the common walkways. On one side of the grand court, surrounded by fountains, is an elevated stage where many activities and exhibitions take place. On the other side of the grand court is an information booth. Carpeted areas with cushioned benches are located throughout all three courts.

The building, which includes the common walkways and the three open court areas, is designed to make shopping easy and to promote retail sales. In the building a controlled shopping environment is provided, in that the shopper is isolated from vehicular traffic and noise, public sidewalk solicitations and unfavorable weather. Efforts are made by the management and its tenants to attract shoppers and prospective shoppers and to pursue customer motivation by advance scheduling of events designed to attract public interest. The grand or center court of the mall is consistently used by the management and its tenants to stage such events of public interest.

One of Wagner's duties as center manager was to administer the policy adopted by Westfarms entitled, "TRESPASSING-DEMONSTRATIONS." This policy states as follows:

"ANY UNAUTHORIZED ACTIVITY (EXCLUSIVE OF LABOR ACTIVITY) IN THE COMMON AREAS NOT DIRECTLY RELATED TO THE PURPOSE FOR WHICH WESTFARMS WAS DEVELOPED REGARDLESS OF

WHETHER THAT ACTIVITY IS CONDUCTED BY ONE OR MORE PERSONS AND REGARDLESS OF WHETHER THAT ACTIVITY IS PEACEFUL OR NON-PEACEFUL WILL BE CONSIDERED UNLAWFUL TRESPASSING AND IT WILL BE TREATED AS SUCH BY THE OWNERS AND MANAGING AGENTS OF WESTFARMS. BY WAY OF EXAMPLE, AND NOT TO BE A COMPLETE LIST, THE FOLLOWING ARE ACTIVITIES WHICH CONSTITUTE TRESPASSING AND WILL NOT BE PERMITTED: SOLICITING, SPEECH MAKING, DISTRIBUTING HANDBILLS OR OTHER LITERATURE, SEEKING SIGNATURES ON PETITIONS, OR TAKING SURVEYS (OR ANYTHING ELSE WHICH MIGHT BE CLASSIFIED AS EXPRESSIVE ACTIVITY). OUR POLICY IS BASED ON THE UNITED STATES SUPREME COURT RULING IN THE CASE OF *Lloyd Corp.* v. *Tanner,* 407 U.S. 551 [, 92 S. Ct. 2219, 33 L. Ed. 2d 131] (1972). WESTFARMS IS PREPARED TO TAKE EVERY LEGAL AVENUE TO PREVENT SUCH TRESPASS AND WHEN REQUIRED BY THE POLICE, WILL PROSECUTE VIOLATORS TO THE FULL EXTENT OF THE LAW."

It applies to all of the mall property and is intended by the defendants to avoid any annoyance to customers, the creation of litter, and the potential creation of disorder, as well as to allow only activities which are compatible with the purpose of the mall and the atmosphere sought to be preserved by the defendants.

NOW has organized a nationwide campaign to ensure ratification of the ERA by its June 30, 1982 deadline. The campaign consists of two parts: one, seeking millions of signatures for petitions in support of the ERA to be sent to the president of the United States and, two, soliciting membership in the form of a two dollar contribution to cover costs of the NOW Message Brigade, a computerized list of ERA supporters who can be mobilized by NOW to help per-

suade political figures to support the ERA. Because of the large volume of people who daily frequent Westfarms Mall, the plaintiffs are seeking to conduct that campaign in the common areas of the shopping center. Cologne, on or about May 25, 1981, telephoned Wagner to request permission to seek signatures at the shopping center for petitions to be sent to the president in support of the ERA and to solicit memberships in the Message Brigade. At that time she also requested a copy of the defendants' written policy relating to petitions and solicitations at Westfarms Mall. That she received on or about May 27, 1981, when she hand-delivered to Wagner a written "request to petition shoppers at the West Farms Mall for signatures in support of the Equal Rights Amendment." At that time she did not seek authorization to solicit paid memberships in the NOW Message Brigade. Wagner advised Cologne that that request was prohibited by the defendants' written policy.

The defendants have allowed other groups to conduct activities in the center or grand court free of charge. They and their tenants sponsor activities which they believe will increase traffic for the benefit of the tenants and will accommodate the patrons and shoppers. Those activities have consisted of exhibitions, displays, concerts, health and fashion shows, educational fairs, Law Day informational programs, volunteer tax help clinics and state lottery drawings. The only complaints received from shoppers or tenants concerning such uses of the grand court pertained to the loudness of the band music. Permission has previously been denied for a political campaign speech, for disaster relief collection, for a charitable package-wrapping service and for church bazaars and cake sales. Distribution of literature in the parking lot has been prohibited by the defendants' security officers in accordance with the declared policy.

The defendants express the following concerns in denying the request of the plaintiffs for public use of

the grand court area: (1) they may be compelled to allow future activities by various other groups, some of which may be controversial and may support positions which they may not share; (2) solicitation by special interest groups may offend some patrons; (3) offended patrons may not return, thus reducing rental values, many of which are based on sales volume, and causing a loss of income to the defendants; (4) allowing special interest groups to petition or to solicit patrons is to permit activity which is not consistent with the controlled environment intended to be created; (5) they will receive no fee or other compensation from the plaintiffs or other special interest groups or from any local, state or federal government or agency.

In this action the plaintiffs have outlined the specifics of their request. They seek to be allowed, on Saturdays only, to set up a booth in the center or grand court to be staffed by no more than four people at any one time. Their activity would be confined to that booth and its immediate vicinity. In addition, they are willing to adhere to any reasonable time, place and manner regulations.

Pruned to its essence, the plaintiffs' claim for a permanent injunction simply asserts that the defendants' policy prohibiting the plaintiffs from soliciting signatures at Westfarms Mall infringes upon their right of free speech, under article first, § 4, and their right to petition, under article first, § 14, of the constitution of Connecticut. The defendants, on the other hand, deny those constitutional grounds and assert their own constitutional rights in defense of their stand. In summary, the defendants allege: (1) the plaintiffs have no right under the Connecticut constitution to use their private property for solicitation of signatures and money for their cause; (2) according to substantial federal precedent, the protection of free expression does not require access to a shopping mall;

(3) the granting under state law to the plaintiffs of access to Westfarms Mall for public solicitation would constitute a taking of private property without just compensation in violation of the fifth and fourteenth amendments to the United States constitution; (4) the granting to the plaintiffs of a right of access to the defendants' property under the state constitution will interfere with the reasonable investment-backed expectations of the defendants and diminish the value of their shopping center without just compensation, and (5) the plaintiffs' right of access under court mandate would infringe upon the defendants' rights under the first and fourteenth amendments to the United States constitution to control their speech and their association and beliefs.

The issuance of an injunction rests in the sound discretion of the trial court. *O'Neill* v. *Carolina Freight Carriers Corporation,* 156 Conn. 613, 618, 244 A.2d 372 (1968). Relief by way of a mandatory injunction is an extraordinary remedy granted only under compelling circumstances. *Simmons* v. *Budds,* 165 Conn. 507, 515, 338 A.2d 479 (1973), cert. denied, 416 U.S. 940, 94 S. Ct. 1943, 40 L. Ed. 2d 291 (1974). "A party seeking injunctive relief has the burden of alleging and proving irreparable harm and lack of an adequate remedy at law. The allegations and proof are conditions precedent to the granting of an injunction." *Hartford* v. *American Arbitration Assn.,* 174 Conn. 472, 476, 391 A.2d 137 (1978).

The plaintiffs have alleged both irreparable harm and lack of an adequate remedy at law. The irreparable harm claimed is the alleged infringement of the plaintiffs' constitutional rights of free speech and petition. Such an infringement of lawful rights would per se constitute irreparable harm. *Johnson* v. *Bergland,* 586 F.2d 993 (4th Cir. 1978); *Fortune Society* v. *McGinnis,* 319 F. Sup. 901 (S.D.N.Y. 1970). As for the lack of an adequate remedy at law, this court

finds that the plaintiffs' constitutional claims could only be raised at law as a defense if they would subject themselves to arrest for trespassing. See *State* v. *Martin,* 35 Conn. Sup. 555, 398 A.2d 1197 (1978); *State* v. *Felmet,* 302 N.C. 173, 273 S.E.2d 708 (1981); *Commonwealth* v. *Tate,* 495 Pa. 158, 432 A.2d 1382 (1981). Before deciding whether to grant the mandatory injunction, this court must weigh and balance the respective equities of both parties. An injunction will only be granted if it is shown that the plaintiffs' actual and substantial damage would be greatly disproportionate to the injury caused to Westfarms. *DeCecco* v. *Beach,* 174 Conn. 29, 35, 381 A.2d 543 (1977); *Hartford Electric Light Co.* v. *Levitz,* 173 Conn. 15, 21, 376 A.2d 381 (1977); *Simmons* v. *Budds,* supra; *Koepper* v. *Emanuele,* 164 Conn. 175, 178, 319 A.2d 411 (1972).

The plaintiffs admit that were this case to be brought under the first amendment to the United States constitution,[1] their access to the defendants' mall would properly be denied. *Lloyd Corporation* v. *Tanner,* 407 U.S. 551, 92 S. Ct. 2219, 33 L. Ed. 2d 131 (1972). See also *Hudgens* v. *NLRB,* 424 U.S. 507, 96 S. Ct. 1029, 47 L. Ed. 2d 196 (1976). Cologne and Connecticut NOW's claim for an injunction is based, however, only on provisions of the Connecticut constitution. The plaintiffs contend that recent decisions in similar cases are persuasive, if not controlling. See *PruneYard Shopping Center* v. *Robins,* 447 U.S. 74, 100 S. Ct. 2035, 64 L. Ed. 2d 741 (1980), aff'g 23 Cal. 3d 899, 592 P.2d 341 (1979); *State* v. *Schmid,* 84 N.J. 535, 423 A.2d 615 (1980); *Commonwealth* v. *Tate,* supra; *Alderwood Associates* v. *Washington Environmental Council,* 96 Wash. 2d 230, 635 P.2d 108 (1981).[2]

---

[1] The first amendment to the United States constitution provides: "Congress shall make no law . . . abridging the freedom of speech, or . . . the right of the people . . . to petition the Government for a redress of grievances."

[2] All of these cases were decided under state constitutional provisions similar to provisions of the Connecticut constitution.

The basic issue in this case is whether the Connecticut constitutional provisions for free speech and the right to petition should be interpreted more broadly than the provisions found in the federal constitution. Any analysis must start with the fundamental proposition that the federal constitution is controlling over the constitutions of the various states by virtue of the supremacy clause, article six of the United States constitution.[3] *Kurtz* v. *Farrington,* 104 Conn. 257, 263, 132 A. 540 (1926).

The United States constitution, however, defines the *minimum* level of rights that citizens are afforded. *Cooper* v. *Morin,* 49 N.Y.2d 69, 399 N.E.2d 1188 (1979). State courts, through interpretation of their constitutions, may expand the individual liberties of their citizens beyond those conferred by the federal constitution. *PruneYard Shopping Center* v. *Robins,* supra, 81.

Connecticut courts have not before this time reviewed the comparative issues surrounding parallel rights under the federal and state constitutions. The Connecticut Supreme Court has, however, stated that the interpretation of this state's constitution is not bound by federal constitutional construction. *Griswold Inn, Inc.* v. *State,* 183 Conn. 552, 559 n.3, 441 A.2d 16 (1981); *Fasulo* v. *Arafeh,* 173 Conn. 473, 475, 378 A.2d 553 (1977). Particularly indicative of the Supreme Court's willingness to read the Connecticut constitution more broadly than its federal counterpart is its decision in *Horton* v. *Meskill,* 172 Conn. 615, 376 A.2d 359 (1977). "Paraphrasing the language of the California Supreme Court in *People* v. *Longwill,* 14 Cal. 3d 943,

---

[3] Article six of the United States constitution states: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

951 n.4, 538 P.2d 753 [1975]: In the area of fundamental civil liberties – which includes all protections of the declaration of rights contained in article first of the Connecticut Constitution – we sit as a court of last resort, subject only to the qualification that our interpretations may not restrict the guarantees accorded the national citizenry under the federal charter. In such constitutional adjudication, our first referent is Connecticut law and the full panoply of rights Connecticut residents have come to expect as their due. Accordingly, decisions of the United States Supreme Court defining fundamental rights are persuasive authority to be afforded respectful consideration, but they are to be followed by Connecticut courts only when they provide no less individual protection than is guaranteed by Connecticut law."[4] Id., 641–42.

In the present case the court is primarily concerned with the free speech and petition clauses of the state constitution and the first amendment to the federal constitution. The plaintiffs argue that the state provisions are affirmative grants of free speech and petition rights and, as such, are different from – more expansive than – the federal provisions, which prohibit governmental restriction of those rights. Article first, § 4, of the state constitution in unequivocal language guarantees and grants to everyone freedom of speech in these terms: "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty."

[4] *Horton* v. *Meskill*, 172 Conn. 615, 376 A.2d 359 (1977), struck down the way Connecticut financed the public education system as violative of constitutional equal rights and equal protection guarantees. The court distinguished the United States Supreme Court decision of *San Antonio Independent School District* v. *Rodriguez*, 411 U.S. 1, 93 S. Ct. 1278, 36 L. Ed. 2d 16 (1973). This court is not unmindful of a distinguishing characteristic of *Horton* – the Connecticut constitution has a separate and distinct provision guaranteeing the right to a free public education, article eighth, § 1, while the federal constitution has no such clause. *Horton* is cited here solely for the purpose of showing a willingness by the Connecticut Supreme Court to interpret this state's constitution more expansively than the federal constitution.

Similarly, article first, § 14, in these equally clear words secures to Connecticut residents the right to petition any government: "The citizens have a right, in a peaceable manner, . . . to apply to those invested with the powers of government, for redress of grievances, or other proper purposes, by petition, address or remonstrance." The plaintiffs draw attention to those precise grants of the right of free speech and the right to petition by comparing the provisions of the first amendment to the constitution of the United States: "Congress shall make no law . . . abridging the freedom of speech, or . . . the right of the people . . . to petition the Government for a redress of grievances."[5]

In previous freedom of speech cases, the courts of this state adopted the reasoning of cases interpreting the first amendment to the federal constitution. See *State* v. *Andrews,* 150 Conn. 92, 186 A.2d 546 (1962); *State* v. *Sul,* 146 Conn. 78, 147 A.2d 686 (1958); *State* v. *Cantwell,* 126 Conn. 1, 8 A.2d 533 (1939); *State* v. *Hoskins,* 35 Conn. Sup. 587, 401 A.2d 619 (1978). Those cases involved state action. The Connecticut Supreme Court has never had an opportunity to articulate free speech or right to petition standards in a factual situation such as the one now before the court. The United States Supreme Court, however, has over the years developed relevant law applicable to the present facts and circumstances.

In *Marsh* v. *Alabama,* 326 U.S. 501, 66 S. Ct. 276, 90 L. Ed. 265 (1946), a company-owned town was held to be the "functional equivalent" of a municipality. As such the Supreme Court held that distribution of religious literature on the "city" streets was protected

---

[5] Article first, § 5, of the Connecticut constitution also protects freedom of speech from governmental encroachment: "No law shall ever be passed to curtail or restrain the liberty of speech or of the press"; but the federal constitution has no provisions similar to article first, §§ 4 and 14, affirmatively granting to all people the right of free speech and the right to petition government.

by the first amendment. Years later, the court applied the *Marsh* rationale to privately owned shopping centers. In *Amalgamated Food Employees Union Local 590* v. *Logan Valley Plaza, Inc.,* 391 U.S. 308, 325, 88 S. Ct. 1601, 20 L. Ed. 2d 603 (1968), the court concluded that the "Logan Valley Mall is the functional equivalent of a 'business block' and for First Amendment purposes must be treated in substantially the same manner." *Logan Valley* involved union picketing of a store in the shopping center.

The *Logan Valley* reasoning, however, was substantially rejected in *Lloyd Corporation* v. *Tanner,* 407 U.S. 551, 92 S. Ct. 2219, 33 L. Ed. 2d 131 (1972). In *Lloyd,* the "functional equivalent" doctrine, as applied in *Logan Valley* and *Marsh,* was not followed. The court there held that a private shopping center was not required to permit the distribution of anti-war leaflets. That *Lloyd* had in effect overruled *Logan Valley* was made clear in *Hudgens* v. *NLRB,* 424 U.S. 507, 96 S. Ct. 1029, 47 L. Ed. 2d 196 (1976). In *Hudgens,* it was held that a shopping center could ban picketing of one of its stores. The Supreme Court now ruled that the actions of the owners of the private shopping mall were not those of the state and, therefore, were beyond the reach of the first amendment.

Were *Hudgens* to be the final chapter in this judicial history, it would be clear that under federal law the plaintiffs' request for an injunction would have to be denied. In 1980, a new chapter was written when the United States Supreme Court decided *PruneYard Shopping Center* v. *Robins,* 447 U.S. 74, 100 S. Ct. 2035, 64 L. Ed. 2d 741 (1980). In *PruneYard,* the court held that state courts may construe appropriate state constitution provisions to authorize individuals to speak and petition in privately owned shopping malls as long as the exercise of those rights did not unreasonably interfere with the constitutional rights of the property owner.

In *PruneYard Shopping Center* v. *Robins,* supra, the United States Supreme Court considered the precise constitutional questions now presented by the parties, namely: (1) whether the California state constitutional provisions permitted individuals to exercise free speech and petition rights on the property of a privately owned shopping center to which the public was invited and (2) whether such rights of free speech and petition exercised on the property of the shopping mall violated the owner's property rights under the fifth and fourteenth amendments or his free speech rights under the first and fourteenth amendments. For this reason it will be reviewed fully.

PruneYard was a privately owned shopping center in California. It covered approximately 21 acres – 5 devoted to parking and 16 occupied by walkways, plazas, sidewalks, and buildings that contained more than 65 specialty shops, 10 restaurants, and a movie theater. The center was open to the public for the purpose of encouraging the patronizing of its commercial establishments. It had a policy not to permit any visitor or tenant to engage in any publicly expressive activity, including the circulation of petitions, that was not directly related to its commercial purposes. This policy was strictly enforced in a non-discriminatory manner.

The petitioners were high school students who sought to solicit support for their opposition to a United Nations resolution. On a Saturday afternoon they set up a card table in a corner of PruneYard's central courtyard. They distributed pamphlets and asked passersby to sign petitions, which were to be sent to the president and to the members of congress. They were peaceful and orderly and no objection by patrons was noted. A security guard ordered them to leave because their activity violated the shopping center regulations. The guard, however, suggested that they move to the public sidewalk at the center's

perimeter. They immediately left and later sued to enjoin the center and its owner from denying them access for the circulation of their petitions.

The trial court refused an injunction and the intermediate appellate court affirmed that refusal. The California Supreme Court reversed, holding that the California constitution protects "speech and petitioning, reasonably exercised, in shopping centers even when the centers are privately owned." *Robins* v. *PruneYard Shopping Center,* 23 Cal. 3d 899, 910, 592 P.2d 341 (1979). Article one, § 2 (a), of the California constitution provides: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press."[6] Article one, § 3, of the California constitution provides: "[P]eople have the right to . . . petition government for redress of grievances . . . ."[7]

In *PruneYard,* the shopping center, as here, contended that *Lloyd Corporation* v. *Tanner,* supra, denying access, controlled. This argument the United States Supreme Court did not accept. It distinguished *Lloyd,* stating that *Lloyd* was decided under the federal constitution and "[o]ur reasoning in *Lloyd,* however, does not ex proprio vigore limit the authority of the State to exercise its police power or its sovereign right to adopt in its own Constitution individual liberties more expansive than those conferred by the Federal Constitution. . . . In *Lloyd,* supra, there was no state constitutional or statutory provision that had been construed to create rights to the use of private property by strangers, comparable to those found to exist by the California Supreme Court here." (Citations omitted.) *PruneYard Shopping Center* v. *Robins,* supra, 80–81.

---

[6] This section of the California constitution groups together the two freedom of speech provisions contained respectively in article first, §§ 4 and 5, of the Connecticut constitution.

[7] This express right of petition appears in article first, § 14, of the Connecticut constitution.

The United States Supreme Court next considered the claim of the owner that a right to exclude others underlies the fifth amendment guarantee against the taking of property without just compensation and the fourteenth amendment guarantee against the deprivation of property without due process of law. In response, the court acknowledged that "here there has literally been a 'taking' of that right to the extent that the California Supreme Court has interpreted the State Constitution to entitle its citizens to exercise free expression and petition rights on shopping center property. But it is well established that 'not every destruction or injury to property by governmental action has been held to be a "taking" in the constitutional sense.'" (Citation omitted.) Id., 82. The court in resolving this conflict of rights must inquire "into such factors as the character of the governmental action, its economic impact, and its interference with reasonable investment-backed expectations." (Citation omitted.) Id., 83. The court then concluded that "the requirement that appellants permit appellees to exercise state-protected rights of free expression and petition on shopping center property clearly does not amount to an unconstitutional infringement of appellants' property rights under the Taking Clause. There is nothing to suggest that preventing appellants from prohibiting this sort of activity will unreasonably impair the value or use of their property as a shopping center. The PruneYard is a large commercial complex that covers several city blocks, contains numerous separate business establishments, and is open to the public at large. The decision of the California Supreme Court makes it clear that the PruneYard may restrict expressive activity by adopting time, place, and manner regulations that will minimize any interference with its commercial functions. Appellees were orderly, and they limited their activity to the common areas of the shopping center.

In these circumstances, the fact that they may have 'physically invaded' appellants' property cannot be viewed as determinative." Id., 83–84.

The court also found "little merit to appellants' argument that they have been denied their property without due process of law. . . . '[T]he guaranty of due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary or capricious, and that the means selected shall have a real and substantial relation to the objective sought to be obtained.' . . . Appellants have failed to provide sufficient justification for concluding that this test is not satisfied by the State's asserted interest in promoting more expansive rights of free speech and petition than conferred by the Federal Constitution." (Citations omitted.) Id., 84–85.

The final claim of the shopping center that a property owner has a first amendment right not to be forced by the state to use his property as a forum for the speech of others also did not prevail. In this regard, the court observed that "the shopping center by choice of its owner is not limited to the personal use of appellants. It is instead a business establishment that is open to the public to come and go as they please. The views expressed by members of the public in passing out pamphlets or seeking signatures for a petition thus will not likely be identified with those of the owner. Second, no specific message is dictated by the State to be displayed on appellants' property. There consequently is no danger of governmental discrimination for or against a particular message. Finally, as far as appears here appellants can expressly disavow any connection with the message by simply posting signs in the area where the speakers or handbillers stand. Such signs, for example, could disclaim any sponsorship of the message and could explain that the persons are communicating their own messages by virtue of state law." Id., 87.

The court, therefore, concluded "that neither appellants' federally recognized property rights nor their First Amendment rights have been infringed by the California Supreme Court's decision recognizing a right of appellees to exercise state protected rights of expression and petition on appellants' property" and affirmed the state court's judgment in its entirety. Id., 88.

Just as shopping areas spread, as did the residential population, in the post-war years from our cities into suburban centers with fancy and enticing names, so has the United States Supreme Court by *PruneYard* now extended the rights of free speech and petition from downtown shopping crowds to the patrons of our new malls. Simply put, those fundamental rights have followed the crowd as part of their legal heritage. Standards have now been established for courts to extend the rights of expression and petition into the "courts" and "courtyards" of shopping malls and centers.

The state of Washington was first in what is foreseen as a parade of state authorities following the leader—*PruneYard*. *Alderwood Associates* v. *Washington Environmental Council*, 96 Wash. 2d 230, 635 P.2d 108 (1981), decided on October 15, 1981, found the solicitation of petition signatures in a private shopping center to be protected by the Washington constitution. Alderwood Mall was a regional shopping center with more than 1,000,000 square feet of store area on 110 acres of land. It contained parking for more than 6000 automobiles. The petitioners sought permission to solicit signatures in the mall in order to qualify their initiative proposal for the ballot. Although the request was denied, the petitioners proceeded to gather signatures there. Even after they were asked to remove their card table, they still continued to obtain signatures in a nonobstructive manner. There was no claim of annoyance or

harassment or interference with business activities. After the owners obtained a temporary restraining order, the Court of Appeals stayed the order and certified the issue to the state Supreme Court, which reversed the trial court.

After a recital of the holdings in *PruneYard* reviewed here, the Washington court outlined the mode of procedure for it, and others, including this court, to follow: "We must therefore determine whether our state law, which is similar to that of California, confers a speech right greater than that of the first amendment to the United States Constitution and, if so, did it protect petitioners' actions." Id., 236.

The guarantee of free speech under the Washington constitution is like that of California, and Connecticut, too. It is found in article 1, § 5, which provides: "Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that right." The court observed: "The California constitutional speech guaranty, article 1, section 2, is substantially similar to section 5. In fact, section 5 was modeled after it." *Alderwood Associates* v. *Washington Environmental Council,* supra, 240. The court also contrasted the first amendment to the United States constitution, which "does not require shopping malls to tolerate the signature practice . . . . It specifically limits only governmental interference." Id.

The court acknowledged the holding of the California Supreme Court in *Robins* v. *PruneYard Shopping Center,* 23 Cal. 3d 899, 592 P.2d 341 (1979), that the California constitutional guarantee of free speech does not require "state action," as defined by the United States Supreme Court, ruling that was so "because of the linguistic differences between the state and federal provisions and because the 'state action' requirement of the Fourteenth Amendment is the product of several factors not relevant to the state

provisions." *Alderwood Associates* v. *Washington Environmental Council,* supra, 241. Since Washington's free speech provision was similar to that of California considered in *Robins* v. *PruneYard Shopping Center,* supra, the court then concluded that it too was "not limited by the factors confronting the United States Supreme Court when it applies the Fourteenth Amendment. This permits us to evaluate in each case the actual harm to the speech and property interests." *Alderwood Associates* v. *Washington Environmental Council,* supra, 243.

Free speech under the state constitution, the court ruled, was not, however, without limitation. It had to be balanced against competing property rights. Free speech under the state constitution would prevail only when, after balancing all interests, the balance favors it. Therefore, when the guarantee of free speech will apply to private conduct must evolve with each decision, for an all inclusive definition is not practicable. The approach involves balancing several factors. The first is the use and nature of the private property. As property becomes the functional equivalent of a downtown area or other public forum, reasonable speech activities become less of an intrusion on the owner's autonomy interests. When property is open to the public, the owner has a reduced expectation of privacy and, as a corollary, any speech activity is less threatening to the property's value.

A second factor is the nature of the speech activity. The exercise of free speech is given great weight in the balance, because it is a preferred right. The potential for reasonable regulation of the speech must also be considered. The time, manner, and place of the exercise of that right may be regulated.

After balancing all those factors and finding no violation of the owners' constitutional rights, the court measured the balance in favor of the contested

activity and found that Washington's constitutional provision of free speech protected the petitioners' actions at the mall. Id., 246.

Westfarms Mall is a horizontal conglomerate of 3 major department stores, 132 other retail establishments, 3 cinemas and 14 restaurants, in a single building of 1,000,000 square feet under a common roof of 24 acres in size, surrounded by a parking area of 48 acres for approximately 5010 cars and 24 additional acres of private streets and grounds. The land and building are vast in size. It is the largest shopping center in Connecticut. Westfarms Mall allows the convenience and variety of downtown shopping without leaving the building. Parking is available in an adjoining lot, although this may sometimes be "several blocks" away. It is policed by the Farmington police department on a regular basis, in addition to its own security force.

Westfarms Mall is the approximate size of Alderwood Mall which the Washington court found to be approximately five times larger than the PruneYard Shopping Center of 21 acres, of which 5 acres were devoted to parking. All conclusions of the Washington and California courts concerning Alderwood Mall or PruneYard Shopping Center as a "functional equivalent of a downtown area or other public forum" and as to their "public nature" apply with equal force to Westfarms Mall. The defendants have opened their doors wide to the public. As was once said: "The business of America is business." And so it is with the defendants: "The business of Westfarms Mall is business – with people – the public." Since their property is necessarily open to the public, the defendants have "a reduced expectation of privacy and, as a corollary, any speech activity is less threatening to the property's value." *Alderwood Associates* v. *Washington Environmental Council,* supra, 244.

The nature of the proposed speech and petition activities is purely governmental. Those activities relate to a high purpose – the adoption of a pending amendment to the constitution of the United States. The plaintiffs' activities are part of a nationwide campaign to ensure ratification of the ERA by its June 30, 1982 deadline. Because of that time constraint, now is the time for NOW to act in pursuit of its goal. The petitions that the plaintiffs would gather at Westfarms Mall will be sent to the president of this country. In that way the plaintiffs hope to be heard. Supporting their endeavor is this state's interest in the adoption of the ERA, Connecticut having ratified the proposed amendment on March 15, 1973. "The exercise of free speech is given great weight in the balance, because it is a preferred right." *Alderwood Associates* v. *Washington Environmental Council,* supra, 244.

The potential for reasonable regulation must be considered in balancing the respective interests of the parties. Although the plaintiffs requested that they be allowed to conduct their activities on Saturdays at a booth in the center or grand court to be staffed by no more than four people at any one time, they are willing to abide by any reasonable regulations governing the time, manner, and place of the exercise of their rights of expression and petition. The activities sought are susceptible to reasonable regulation and could be performed in a manner that accommodates the needs of all parties concerned.

The proposed activities of the plaintiffs would not so affect the value or use of the mall as to constitute a "taking" of the property under the fifth amendment. Nor would the exercise by the plaintiffs of their rights of free expression and petition in any way unconstitutionally infringe upon the defendants' property rights under the fourteenth amendment. Any interference with the mall's commercial functions can be mini-

mized by the defendants' reasonable time, place and manner regulations which the plaintiffs have indicated they are willing to accept. The defendants' fear of diminution of the value of their property in the event access is granted to the plaintiffs by the court is speculative. One might even guess that its value would increase, for in jest and in truth, women are traditionally known to be shoppers, and NOW is supporting the women's cause. There is also little merit to the defendants' claim that access of the plaintiffs to the mall would infringe upon Westfarms' first and fourteenth amendment rights to control their speech as well as their associations and beliefs. The answer to that contention of the defendants can be found in the United States Supreme Court's suggestion in *PruneYard Shopping Center* v. *Robins,* supra, 87: "Finally, as far as appears here appellants can expressly disavow any connection with the message by simply posting signs in the area where the speakers or handbillers stand. Such signs, for example, could disclaim any sponsorship of the message and could explain that the persons are communicating their own messages by virtue of state law."

The geographics of Westfarms Mall separates the grand or central court from the retail areas of the shopping center. In the layout of the building it is an island in the center of, and separated from, the walkways leading to the shops, stores, restaurants and cinemas. The floor of the court is three steps below the level of the encircling walkways. The four-foot barriers between the court and the surrounding walkways rise two feet above the floor of the walkways. This design of the court isolates the activities conducted there from the shoppers on the walkways and in the nearby shops, except possibly by sight and sound. Entry into the court is by individual choice of the patrons for information, rest and par-

ticipation in, or closer observation of, permitted activities. Commercial enterprises are not conducted in the court.

The mall building is twenty-four acres in size, more or less. This is the equivalent area of approximately twenty-two football fields. The grand court contains approximately 14,000 square feet, or about one-third of an acre. The plaintiffs seek access to a very small portion of the court, this constituting a tiny part of the building area separated and isolated from the business activities of the mall.

From all of these facts and circumstances, the court finds that the plaintiffs' campaign would create only the slightest interference with the defendants' autonomy and ownership of the mall, if any, and would not violate any of their asserted constitutional rights. On the other hand, to bar the plaintiffs' activities would undermine their constitutional rights of free speech and petition in what is functionally by design, purpose and dedication a public mall and community business center. It is descriptive of the public character of Westfarms Mall that its name appears to be a consolidation of the names of West Hartford and Farmington, the two towns which share its location and whose common boundary was erased by the mall's superimposition over it.

The consideration of all relevant factors by the court shows their balance to be in favor of the plaintiffs. Accordingly, the court finds: (1) the proposed solicitation of signatures by the plaintiffs is protected by article first, §§ 4 and 14, of the Connecticut state constitution; (2) the plaintiffs have no adequate remedy at law; and (3) the plaintiffs will suffer irreparable harm unless the defendants are restrained and enjoined from prohibiting the plaintiffs from seeking signatures in support of the ERA.

Now, therefore, it is hereby ordered, that, subject to the further order of this court, and until the ERA is

ratified by three-fourths of the several states, or until July 1, 1982, whichever occurs first, the defendants shall be, and hereby are, restrained and enjoined from preventing or interfering with the plaintiffs' solicitation by voice, signs and descriptive materials of signatures on petitions addressed to the president of the United States in support of the ratification of the ERA on property owned and operated by the defendants as a shopping center in West Hartford and Farmington, Connecticut, known as Westfarms Mall, at a single location in the center or grand court to be designated by the defendants, on the following terms and conditions:

1. The plaintiffs will be allowed to conduct their activities every Saturday during normal business hours, unless such schedule will interfere with mall sponsored activities or events, in which event a substitute day in close proximity thereto will be offered by the defendants; should the plaintiffs wish to suspend their activities on any Saturday or other allowed day, they will promptly notify the center manager.

2. The plaintiffs will supply their own card or party table not to exceed three feet by six feet in size, no more than four chairs, and a proper receptacle for litter, but the defendants, at their option, may offer to substitute their property for any or all of such furniture.

3. The plaintiffs will be allowed to post two signs, not to exceed two feet by three feet in size, on or adjacent to their table announcing their presence and purpose.

4. The plaintiffs will be confined to the center or grand court in the immediate area of their table and chairs and to the space within ten feet of their table.

5. The plaintiffs will confine their activities to the authorized area and will not expand into the remain-

ing space of the grand court, or use the walkways, entranceways, exits, parking lots or other common areas of the mall for their permitted activities.

6. The plaintiffs will at no time have more than four persons engaged in the permitted activities within the authorized area.

7. The plaintiffs will at all times maintain a normal conversational tone, and will not use any sound, recording or radio equipment.

8. The plaintiffs will refrain from: (a) verbally inviting patrons to their table and authorized area; (b) accosting or approaching patrons outside the authorized area; (c) physically obstructing or verbally interfering with patrons; and (d) restricting in any other way the free movement of patrons and shoppers on the premises.

9. The plaintiffs will not be allowed to distribute membership applications, or to solicit membership applications, fees, funds, donations or contributions, but materials distributed in support of the permitted activities may contain instructions for off-premises voluntary participation in membership application and financial support of the plaintiffs' activities.

10. No eating or drinking by plaintiffs' personnel will be permitted at their table or within the court area or surrounding walkways.

11. The plaintiffs will allow no litter to be discarded in the area of the grand court other than in waste receptacles, and will periodically police and clean all litter in the walkways of the mall resulting from materials distributed by them, and for this purpose will not be limited in the number of their personnel allowed on the premises.

12. The defendants will instruct their security force to protect all rights, persons and property of the plaintiffs in connection with their permitted activities.

13. The defendants will be allowed to post signs with noncontroversial texts, the number, size and location to be at their discretion, disavowing and disclaiming any endorsement, sponsorship or support of the plaintiffs' presence, activities, purpose and goals.

14. The plaintiffs' permitted activities shall be subject to such further reasonable regulations as to time, place and manner as the defendants may prescribe to assure that the plaintiffs do not interfere with the movement and rights of owners, operators, patrons, shoppers and occupants of the shopping center and to minimize any possible interference of the plaintiffs with the commercial functions of the mall.

Judgment may enter for the plaintiffs with taxable costs.