**Debra Lee WINIK–NYSTRUP, Plaintiff,**

v.

**MANUFACTURERS LIFE INSURANCE CO., Defendant.**

**No. CIV. 3:94CV0947 JBA.**

United States District Court,
D. Connecticut.

March 31, 1998.

James E. Swaine, Law Offices of James E. Swaine, New Haven, CT, for Debra Lee Winik–Nystrup, plaintiff.

S. Dave Vatti, Zeldes, Needle & Cooper, Bridgeport, CT, William C. Longa, Woodbridge, CT, for Manufacturers Life Ins. Co., defendant.

## RULING ON DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DOC. # 37]

ARTERTON, District Judge.

Plaintiff Debra Lee Winik–Nystrup raises several claims arising out of her discharge from her position with defendant Manufacturers Life Insurance Company ("Manulife"). Plaintiff alleges that the discharge violated Connecticut General Statute Section 31–51q and public policy. (Compl. at 5–7). In addition, plaintiff alleges that Manulife breached its implied employment contract and the implied covenant of good faith and fair dealing. (Compl. at 7–9).

Defendant Manulife has moved for partial summary judgment with regard to the claims

that the discharge violated the plaintiff's rights to free speech and association and Connecticut General Statute section 31–51q. The background is as follows.[1]

On May 10, 1989, plaintiff was hired by Manulife to serve as a Policy Service Representative in exchange for a salary and benefits. In 1990, she was promoted to the position of New Business Specialist.[2] On August 30, 1993, plaintiff submitted a one week vacation request to Shane for the week of September 30, 1993. On August 30, 1993, Shane approved the plaintiff's request for a vacation. The following day, Shane stated that he would have to confirm the vacation with Koch. Koch later informed the plaintiff that her vacation was approved.

On September 8, 1993, the plaintiff informed Shane that she was going to Spain as a guest of a friend who was employed by a competitor of Manulife. The trip, sponsored by another competitor of Manulife, was an award for brokers and employees of a number of other competitors who would also be attending. After this disclosure, Shane said that the plaintiff could still take her vacation. On September 10, 1993, Koch told the plaintiff that she would be fired from her job if she went on the vacation because it would violate Manulife's conflict of interest policy. At that time, plaintiff told Koch that she was attending the trip with her friend, a former employee of Manulife and a current employee of a competitor, and that she was going to be his guest. Koch stated that as a result of that personal relationship the Production Manger promotion was rescinded and her employment with Manulife was jeopardized. Koch told the plaintiff that if she discontinued her personal relationship within six months she could maintain her employment. Koch claimed that Manulife policy prohibited such personal relationships.

1. The following facts are taken from the plaintiff's complaint.

2. In addition, on August 18, 1993, plaintiff spoke with her immediate supervisor, Andrew Shane, regarding her applying for the position of Production Manager. She agreed to consult Doug Koch, the General Manager. Koch provided plaintiff with a job description for the Production Manager's position. Koch also requested that the plaintiff assemble a list of her skills that she believed were relevant to the Production Manager position. On September 8, 1993, Koch informed the plaintiff that she would commence training for the Production Manager position and that a formal announcement of her move to the position would be made. (Compl. at 2–3).

On September 13, 1993 Koch requested that the plaintiff take a few days off and added, among other things, that her vacation leave was now denied. On September 15, Koch reiterated that her employment would be terminated if she took the trip. Plaintiff told Koch that she was going on the vacation. On September 16, 1993, Koch told the plaintiff that her employment with Manulife was terminated for cause effective immediately. This suit followed.

## DISCUSSION

### The Relevant Statute

Connecticut General Statute section 31–51q prohibits employers from disciplining or discharging an employee for exercising rights protected by the First Amendment to the United States Constitution and sections 3, 4, and 14 of the Connecticut Constitution.[3] It provides in relevant part:

> Any employer ... who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4, or 14 of article first of the constitution of the state, provided that such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer, shall be liable to such employee for damages caused by such discipline or discharge, including punitive damages, and for reasonable attorney's fees as part of the costs of any such action for damages.

In order to demonstrate a violation of section 31–51q, plaintiff must prove that: (1) she was exercising rights protected by the first amendment to the United States Constitution or by an equivalent provision of the Connecticut Constitution; (2) she was fired "on account of" her exercise of such rights; and (3) her exercise of first amendment or equiva-lent state constitutional rights did not substantially or materially interfere with her bona fide job performance or with her working relationship with her employer. *See Gottlob v. Connecticut State Univ.*, 1996 WL 57087, * 3 (Conn.Super.); *Daley v. Aetna Life & Casualty*, 1994 WL 422642, * 2 (Conn.Super.). Essentially the plaintiff must show protected activity, adverse action, a causal relationship between the activity and the adverse action, and that the protected activity did not interfere with the central purposes of the employment relationship.

Connecticut courts have explained the purposes and substantive underpinnings of section 31–51q:

> Section 31–51q is a remedial statute, enacted to provide protection for vitally important free speech and free expression rights guaranteed by the state and federal constitutions.... The question is not whether a plaintiff can sue a private party for infringement of state and federal free speech constitutional rights but whether a state by statute can confer· on an individual the right to sue a private party for the same type of infringements that it would be illegal for the state or federal governments to engage in. The answer is why not—the state in passing a statute like section 31–51q is not per se extending the ambit of the state or federal constitution but is in effect using those documents and the case law interpreting the constitutional provisions for the purpose of defining the scope or ambit of rights created by a statute meant to provide a cause of action against private parties.

*Bakelman v. Paramount Cards, Inc.*, 1994 WL 324363, * 2 (Conn.Super.) (internal quotation omitted). This Court will consider plaintiff's claims in light of the existing federal and state case law.

---

**3.** Section 3 of the Connecticut State Constitution provides in relevant part: "The exercise and enjoyment of religious profession and worship, without discrimination, shall forever be free to all persons in the state." Section 4 of the Connecticut State Constitution provides in relevant part: "Every citizen may freely speak, write, and publish his sentiments on all subjects, being re-sponsible for the abuse of that liberty." Section 14 of the Connecticut State Constitution provides that: "The citizens have a right, in a peaceable manner, to assemble for their common good, and to apply to those invested with the powers of government, for redress of grievances, or other proper purposes, by petition, address, or remonstrance."

For purposes of this partial summary judgment motion, Manulife contests the first prong of a section 31–51q claim, namely whether the activity plaintiff engaged in was protected. Plaintiff argues that her statements regarding her vacation and her act of taking the vacation were protected as exercises of her free speech and association rights guaranteed by the First Amendment to the United States Constitution as applied through section 31–51q.

### Speech Claim

■ The United States Supreme Court, lower federal courts, and Connecticut courts have determined that an employee's statements are not constitutionally protected, and correspondingly not protected under section 31–51q, when they relate exclusively to matters concerning the employee's personal interests, as opposed to matters of public concern. *See Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (setting forth generally the "matter of public concern" standard); *Urashka v. Griffin Hospital,* 841 F.Supp. 468, 473 (D.Conn.1994) (applying standard under section 31–51q); *Schnabel v. Tyler,* 230 Conn. 735, 749–50, 646 A.2d 152 (1994) (applying standard under section 31–51q); *Emerick v. Kuhn,* 1995 WL 405678, * 3 (Conn.Super.) (applying standard under section 31–51q); *Daley,* 1994 WL 422642, * 2 (applying standard under section 31–51q); *Bakelman v. Paramount Cards,* 1994 WL 324363, * 3 (Conn.Super.) (applying standard under section 31–51q).

In *Connick* the Supreme Court explained the limits of federal constitutional protection of speech by public employees:

> when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matter only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agent allegedly in reaction to the employee's behavior. Our responsibility is to ensure that citizens are not deprived of fundamental rights by virtue of working for the government; this does not require a grant of immunity for employee grievances not afforded by the First

Amendment to those who do not work for the state.

461 U.S. at 147, 103 S.Ct. 1684. The Court continued to explain how a court should determine whether an employee was speaking on a "matter of public concern": "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147–48, 103 S.Ct. 1684.

The speech at issue in the plaintiff's case could be viewed only loosely as speech upon a matter of public concern. The plaintiff's speech arguably involved an exercise of her constitutionally protected right to associate with others. Constitutional rights are a matter of public concern. However, the test set forth in *Connick* contemplates not only the very broad topic of the speech, but the role the speaker fulfills when she engages in that speech. So, the court must consider the speaker's role as citizen versus the speaker's role as employee. Here, "there are no allegations that the plaintiff's speech extended beyond the scope of the terms and conditions of her employment." *Urashka,* 841 F.Supp. at 473. An illustrative example is provided by a case where an employee complained about sexual harassment. *See Callaway v. Hafeman,* 832 F.2d 414 (7th Cir.1987). The court reasoned that the employee's speech complaining of sexual harassment was not speech on a matter of public concern. The court explained, "while it is undoubtedly true that incidences of sexual harassment in a public school district are inherently matters of public concern, the *Connick* test requires us to look at the point of the speech in question: was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was the point to further some purely private interest?" *Id.* at 417; *cf. Rode v. Dellarciprete,* 845 F.2d 1195, 1200–02 (3d Cir.1988) (holding protected an employee's speech to reporter in an interview regarding a pattern and practice of racial animus in employment practices).

A situation similar to *Callaway* presents itself here. Constitutional rights inherently involve some public concern; however, in this

case, the employee raised these issues personally and in relation to the terms and conditions of her employment. Accordingly her speech is not on a matter of public concern protected by the United States Constitution, the Connecticut state constitution, and section 31–51q of the Connecticut General Statutes.

### Association Claim

Plaintiff's association claim presents something of a conundrum. Both parties have devoted their discussion to defining the parameters of the federal constitutional right of association. Such definition is no easy task. As a threshold matter, the right to association is not expressly found in any amendment to the United States Constitution. However, the United States Supreme Court has determined that the Constitution protects "freedom of association in two distinct senses." See *Roberts v. United States Jaycees*, 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984).[4] The first has been termed "intimate association." These protections have evolved in case law:

In one line of decisions, the court has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of personal liberty.

*Id.* at 617, 104 S.Ct. 3244. It explained,

[B]ecause the Bill of Rights is designed to secure individual liberty, it must afford the formation and preservation of certain kinds of highly personal relationships a substantial measure of sanctuary from unjustified interference by the State. Without precisely identifying every consideration that may underlie this type of constitutional protection, we have noted that certain kinds of personal bonds

played a critical role in the culture and traditions of the Nation ... [R]elationships with these sorts of qualities are likely to reflect the considerations that have led to an understanding of freedom of association as an intrinsic element of personal liberty.

*Id.* at 618–20, 104 S.Ct. 3244.

The second form of freedom of association has been termed "expressive association." In this line of decisions, "the Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for redress of grievances, and the exercise of religion. The Constitution guarantees freedom of association of this kind as an indispensable means of preserving other individual liberties." *Id.* at 617, 104 S.Ct. 3244. Essentially, "an individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed." *Id.* at 622, 104 S.Ct. 3244.

The question of how the Constitution protects intimate association and expressive association is a central issue of the plaintiff's case. Section 31–51q of the Connecticut General Statutes protects those rights guaranteed by the First Amendment of the United States Constitution and the rights guaranteed under section 3, 4, and 14 of the Connecticut state constitution. Thus, plaintiff must not only show that she has some protected right generally, but that she has a right specifically protected by those provisions. The precise boundaries of expressive and intimate association and their locus in the Constitution was not fully explored in *Roberts*. At one point the Court delineates them by saying that it has "referred to constitutionally protected association in *two distinct senses.*" *Id.* at 617, 104 S.Ct. 3244

4. It is important to note that the Court's discussion of association rights arose in the context of a "conflict between a State's efforts to eliminate gender discrimination against its citizens and the constitutional freedom of association asserted by members of a private organization." *Id.* at 612, 104 S.Ct. 3244. Thus, the Court never fully

confronted the parameters of the two association rights and the interplay between them. The boundaries and overlap of these two association rights as well as their locus in the Constitution is the crucial issue in the case at hand. These issues were never reached in *Roberts*.

(emphasis added). However, on the very same page, the Court notes that "[t]he intrinsic and instrumental features of constitutionally protected association *may, of course, coincide.*" *Id.* (emphasis added). Thus, *Roberts* leaves a crucial issue of plaintiff's case unresolved.

A few courts to consider the issue of the two types of association post *Roberts* have seemed to evaluate them as separate rights protected differently[ by our Constitution. In all of those cases, however, the courts did not resolve the potential overlap between intimate and expressive association, particularly in the dating context. The Second Circuit recently mentioned the two forms of association. *See Sanitation and Recycling Indus., Inc. v. City of New York,* 107 F.3d 985, 996 (2d Cir.1997). In response to garbage carriers' overbreadth challenge to a newly enacted law governing the commercial carting business, the court explained that "we do not need to decide whether overbreadth attacks apply to alleged infringements of the right to intimate association as they do to First Amendment rights, or whether overbreadth challenges do not apply because, as several circuits have held, the right to intimate association lies not in the First but in the Fourteenth Amendment." *Id.*[5]

Another court in this circuit has interpreted *Roberts:* "[t]he United States Supreme Court ... has identified two strands of the right to associate—the 'freedom of intimate association,' located in the Fourteenth Amendment's concept of liberty, and the 'freedom of expressive association' that originates in the First Amendment ..." *Champagne v. Gintick,* 871 F.Supp. 1527, 1532 (D.Conn.1994) (evaluating a First Amendment challenge to a Connecticut stalking law and finding that plaintiff's claim asserted a right to intimate association not cognizable under the First Amendment.). Another court of appeals read *Roberts* in a similar fashion when it noted "the Supreme Court's enunciation of two types of association rights ... freedom of expressive association based on the first amendment and freedom of intimate association, which the Supreme Court characterized as 'an intrinsic element of personal liberty.'" *Griffin v. Strong,* 983 F.2d 1544, 1546 (10th Cir.1993) (internal citation omitted). That court went on to note that "[t]he freedom of intimate association is a substantive due process right." *Id.* at 1547. However, the third circuit recognized that the two forms of protected association "sometimes overlap[ ]." *Rode v. Dellarciprete,* 845 F.2d 1195, 1204 (3d Cir.1988).

In another case, the Seventh Circuit discussed the protection afforded to exchanges like "chit-chat" that are distinguished from political, religious, or other similar discussions. *See Swank v. Smart,* 898 F.2d 1247, 1251–52 (7th Cir.1990).

> [B]ecause chit-chat is important to the participants, ... the freedom to engage in it is an aspect of liberty protected by the due process clause, along with the freedom to exercise other harmless liberties .... [A] law that forbade dating or, for that matter, forbade an off-duty policeman to offer a ride on his motorcycle to a coed—all of these hypothetical laws would infringe liberty. If arbitrary, they would be deemed to violate 'substantive due process,' the term for the protection that the due process clause has been held to extend to substantive rights not listed in the Bill of Rights. Some of these nonenumerated substantive liberties receive broader protection ... under such rubrics as 'right of privacy,' 'fundamental right,' and 'right of association' in a nonexpressive sense. And sometimes these 'fundamental rights' pop up in the employment setting and when they do it is sometimes suggested—erroneously in light of *Roberts* and *Stanglin*[6]—that the First Amendment protects nonexpressive associations.

*Id.* 1251–52. In that case the court specifically considered whether an off-duty officer's offer to give a ride to a college on his motorcycle and the conversation that ensued on that motorcycle was protected under the

---

**5.** The Court also notes that the possible overlap between intimate and expressive association was not at issue and thus not addressed in that case.

**6.** *City of Dallas v. Stanglin,* 490 U.S. 19, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989) (holding that a city ordinance limiting the use of dance halls to persons between the ages of 14 and 18 was not violative of the First Amendment right of association).

First Amendment. The court determined that it was not.

However, this discussion of intimate and expressive association does not end all questions with regard to plaintiff's case. First, *Roberts* does not state unequivocally that the right to intimate association is housed exclusively in the Fourteenth Amendment nor does it state that intimate and expressive association rights are mutually exclusive. The Court makes specific reference to the Bill of Rights and the concept of ordered liberty under the Constitution. Thus, defendant Manulife must not only argue that intimate association rights are separate from expressive association rights, it must argue that the right to intimate association has absolutely no protection within the First Amendment as a matter of law.

Secondly, the defendant has rested its argument on the erroneous premise that all intimate associations, regardless of their nature or quality, can never be expressive. Contrary to this belief, the content of plaintiff's relationship and the circumstances surrounding the planned vacation are relevant to the inquiry of what protection 31–51q affords to the plaintiff in this case.

Thus, the defendant must not only show that the right to intimate association is housed entirely outside the First Amendment, it must also show that there is no genuine issue of material fact as to whether the plaintiff's relationship has an expressive component. One post-*Roberts* court noted the difficulty posed by dating relationships. It explained,

> Dating and other social relationships are worthy of some protection under the first amendment even though these activities may lack an overt political, religious or educational purpose. We do not limit protection to words that are 'strident, contentious, or divisive,' but extend it to 'quiet persuasion, inculcation of traditional values, instruction of the young, and community service.' Our Constitution is designed

to maximize individual freedoms within a framework of ordered liberty. We conclude that dating and other social associations to the extent that they are expressive are not excluded from the safeguards of the first amendment.

*IDK Inc. v. County of Clark,* 836 F.2d 1185, 1194 (9th Cir.1988) (quoting *Roberts,* 468 U.S. at 636, 104 S.Ct. 3244 (O'Connor, J., concurring) (evaluating association rights that attach to escort services and finding none.)); *see also Wilson v. Taylor,* 733 F.2d 1539 (11th Cir.1984) (pre-*Roberts* case deciding that dating relationships are protected by the First Amendment).

On this sparse record, the court has a very limited understanding of Ms. Winik–Nystrup's relationship with the friend with whom she intended to take a vacation. The Court has been forced to analyze the legal issues in this case with virtually no facts in evidence. The plaintiff only mentions fleetingly why her association was protected. She states "The highly personal relationship between Ms. Nystrup and Mr. Harris had within the confines of that relationship the purpose of the advancement of ideas and beliefs shared between two individuals." (Pl.'s Local Rule 9(c) Statement of Material Facts, ¶ 12, at 4). Though this terse statement is far from satisfactory to determine whether the association in this case is indeed protected by the Constitution, it is the defendant's, not the plaintiff's, burden as the movant to demonstrate in a properly supported summary judgment motion no genuine issue of material fact. The defendant has rested its case on too broad a legal claim and has adduced no evidence to assist the Court in determining what association is at issue in this case.[7]

The discussion in *Roberts* and other cases clearly demonstrates that intimate and expressive association are distinguished under the Constitution. What *Roberts* does not state dispositively however, is that intimate association is a wholly separate sphere from expressive association. Moreover, intimate

---

7. At no point in its brief did defendant Manulife address the other two prongs of plaintiff's section 31–51q claim, namely that the plaintiff was fired "on account of" the exercise of her rights; and that plaintiff's exercise of her rights did not "substantially or materially interfere with [her] bona fide job performance or the working relationship between [her] and [Manulife]." The meaning of "on account of" was not briefed by either party. As a result, it is unclear whether this standard requires plaintiff to show that the employer took adverse action specifically because plaintiff engaged in protected activity or whether plaintiff must show only that the employer unduly inter-

association and similar rights such as privacy appear to have their roots in various amendments to the Constitution. Thus, defendant Manulife cannot assert as a matter of law that the right to intimate association lies entirely outside the purview of the First Amendment.

In any event, the defendant has failed to demonstrate that the plaintiff's particular relationship was entirely devoid of any expressive content. This is not a case involving idle chit-chat during a spur-of-the-moment bike ride with a stranger. The Court has no sense of the expressive nature and quality of the plaintiff's relationship and the defendant has failed to show that the Court should not be concerned about this. The plaintiff's association could be both intimate and expressive and thus entitled to protection under the First Amendment. With these considerations in mind, it is clear that Manulife has failed to demonstrate that no genuine issue of material fact exists in this case. It may be the case that after the Court has a record before it, the Court will conclude that Manulife is entitle to judgment as a matter of law pursuant to Rule 50(a). However, it is nonetheless clear that summary judgment cannot enter on this record. Accordingly, Manulife's motion for partial summary judgment is denied without prejudice.

## CONCLUSION

For the foregoing reasons, defendant's Partial Motion for Summary Judgment is DENIED.

IT IS SO ORDERED.

fered with plaintiff's ability to engage in protected activity. Plaintiff alleges that the defendant took action because of her vacation and then her relationship. Defendant contends that the trip violated its conflict of interest policy. The vacation appears to be the triggering event. However, it remains unclear whether the employer's action was on account of the vacation, the association generally, or the expressive content of plaintiff's association.

Moreover, Manulife failed to argue that it took action because plaintiff's planned vacation or her association threatened to substantially or materially interfere with plaintiff's bona fide job perfor-

mance or Manulife's working relationship with the plaintiff. Manulife has stated that it had a conflict of interest policy. However, the Court has no information regarding how that policy functions or the standard that governs what constitutes a conflict of interest.

Thus, the Court will reserve judgment on whether the plaintiff can proceed to a fact finder with regard to these two components of her claim until the court has some semblance of a record before it. Upon such a record, a Rule 50(a) motion for judgment as a matter of law may be an appropriate vehicle to revisit these issues.