Ella DOWNING

v.

**WEST HAVEN BOARD OF ED., et al.**

**No. Civ. A. 3:00CV525 (SRU).**

United States District Court, D. Connecticut.

Aug. 24, 2001.

W. Martyn Philpot, Jr., Laura Lee A. Dorflinger, Law Offices of W. Martyn Philpot, Jr., LLC, New Haven, CT, for plaintiff. .

Floyd Joseph Dugas, Warren L. Holcomb, Berchem, Moses & Devlin, P.C., Milford, CT, for defendants.

### RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

UNDERHILL, District Judge.

Plaintiff Ella Downing ("Downing"), formerly a public school teacher at West Haven High School, brings this action for money damages based upon the defendants' response to her wearing a tee shirt to school reading "JESUS 2000—J2K" on May 24, 1999.[1] Downing alleges that the defendants violated her First Amendment rights to free speech and religious freedom and retaliated against her in violation of 42 U.S.C. § 1983 and the Connecticut Constitution, Article First, Sections 1, 4 and 5. Downing's complaint also alleges that the defendants violated Connecticut General Statutes § 31–51q by disciplining her for exercising her free speech rights. Downing also seeks damages for claims of intentional and negligent infliction of emotional distress.[2]

The defendants—the West Haven Board of Education, certain West Haven High School employees and the individual members of the Board of Education (collectively, "the defendants"), have moved for summary judgment on all of the claims raised in Downing's complaint. For the reasons set forth below, the defendants' Motion for Summary Judgment (doc. # 22) is granted.

### I. BACKGROUND

During the 1998–99 school year, Downing taught keyboarding to students in grades 9 through 12 at the public high school in West Haven, Connecticut. On May 24, 1999, Downing wore a beige tee shirt to school with the words "JESUS 2000—J2K" prominently displayed on the front in capital letters. The words "JESUS 2000" were brown-colored letters that were approximately 5½ inches in height and outlined in black. Centered immediately below were the letters "J2K," approximately 4 inches in height. Downing wore the tee shirt in the classroom during instructional time.

Upon learning of the situation, defendant Martin Taylor ("Taylor"), the "Assistant Instructional Leader" or Vice Principal of the high school, telephoned Laurence Frattini ("Frattini"), an Assistant Superintendent of the West Haven Public Schools. Frattini consulted the law firm of Berchem, Moses & Devlin, P.C., the attorneys who represent the West Haven Board of Education. Acting on the advice of counsel, Frattini called Taylor and instructed him to direct Downing to either cover the tee shirt or go home and change into other clothes.

---

1. Although the plaintiff is no longer employed by the defendants, there is no claim that the plaintiff was terminated as a result of the incident involving the "JESUS 2000—J2K" tee shirt.

2. The plaintiff's action seeks only money damages. There is no claim for injunctive relief set forth in the plaintiff's Corrected Amended Complaint.

Taylor then walked to Downing's classroom, called her out of class and instructed her to either cover the tee shirt or go home and change. Downing subsequently covered the shirt by wearing a lab coat for the remainder of her teaching periods that day.

## II. *SUMMARY JUDGMENT STANDARD*

Summary judgment is appropriate when the evidence demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

When ruling on a summary judgment motion, the court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir.) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party"), *cert. denied*, 506 U.S. 965, 113 S.Ct. 440, 121 L.Ed.2d 359 (1992). When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of his pleadings, but rather must present significant probative evidence to establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir.1995).

Summary judgment is proper "[o]nly when reasonable minds could not differ as to the import of the evidence." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir.1992). If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505. "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 247–48, 106 S.Ct. 2505. To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248, 106 S.Ct. 2505.

## III. *DISCUSSION* [3]

A. *The Board of Education as the Real Party in Interest*

■ The defendants argue that, because the individual members of the West Haven

---

**3.** As a preliminary matter, because the plaintiff's complaint seeks only monetary relief against certain public school employees as well as a local school board and its members, the court has considered the question whether the Eleventh Amendment applies and has concluded that, under the circumstances presented, it does not. *See Mt. Healthy City*

Board of Education are sued only in their official capacities and because there are no allegations that any of those Board members were personally involved in the alleged conduct, the Board of Education is the real party in interest and no cognizable claim has been stated against the Board members. The court agrees.

Where an individual member of a school board is sued only in his or her official capacity, and there are no claims that the member was directly and personally responsible for the alleged conduct, courts in this Circuit have held that the Board, and not that individual member, is the real party in interest. *See, e.g., Rosa R. v. Connelly,* 889 F.2d 435, 437 (2d Cir.1989) ("As a preliminary matter, we note that the district court properly dismissed James Connelly, Superintendent of Schools, as a defendant in this case. Because appellants sought to sue him in his official rather than personal capacity, the Board, and not Connelly, was the real party in interest. Without any allegations that Connelly was "directly and personally responsible for the purported unlawful conduct," appellants failed to assert a distinct claim against him, rendering their complaint as to Connelly 'fatally defective' on its face. We thus proceed to consider appellants' claims against the Bridgeport Board only."), *citing Kentucky v. Graham,*

473 U.S. 159, 165–66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985), and *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 886 (2d Cir. 1987); *see also Mennone v. Gordon,* 889 F.Supp. 53, 55 (D.Conn.1995) (dismissing Superintendent because complaint alleged only that defendant, as Superintendent, served as chief executive officer of the school board and had responsibility for supervision of the school district; there were no specific allegations that the Superintendent was directly and personally responsible for any action or inaction on the part of the school board; accordingly, the school board was the real party in interest.).

The following defendants are identified in the Corrected Amended Complaint as members of the West Haven Board of Education who are sued only in their official capacities: Jolen Barnes; George Belbusti; Timothy Borer; Gerald Calabritto; Curtis Edwards; John Erickson; Robert Guthrie; Trevor Hackley and Deborah Simone. There are no allegations or evidence that these individual members were directly and personally responsible for the purported unlawful conduct. Accordingly, the Board is the real party in interest, and summary judgment is granted in favor of the above-referenced members of the Board.[4]

---

*School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 280–81, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) (11th Amendment did not preclude suit against Ohio school board because bar to suit in federal court does not extend to counties and similar municipal corporations and the school boards' extensive powers to issue bonds and levy taxes and their categorization under state law as a form of political subdivision rendered them more like a county or city) *see also Rosa R. v. Connelly,* 889 F.2d 435, 437–38 (2d Cir.1989) (given scope of authority and source of funding, local Connecticut school board not entitled to 11th Amendment protection from suit in federal court).

4. It appears that George Palermo, the West Haven Superintendent, could also be dismissed on this basis. Although he is sued in *both* his individual and official capacities, and although the complaint charges him with the purported unlawful conduct, there is no evidence to suggest that he had any personal involvement in the matter. It is undisputed that Frattini, the *Assistant* Superintendent, was consulted on the issue; sought the advice of counsel; and ultimately advised Taylor to direct Downing to either cover her tee shirt or change into another shirt. It is also undisputed that, because Taylor spoke with Frattini, he did not consult with Superintendent Palermo. Curiously, Frattini, is not named as a

## B. *Count I –42 U.S.C. § 1983*

The defendants argue that they are entitled to qualified immunity because it was objectively reasonable for them to believe that any restriction of Downing's speech was necessary to avoid an Establishment Clause violation. It is necessary to reach the issue of qualified immunity, however, only if the defendants' "attempt to avoid Establishment Clause violations by restricting the religious expression of one of its teachers infringe[d] that teacher's free exercise rights." *Marchi v. Board of Cooperative Educational Services of Albany*, 173 F.3d 469, 472 (2d Cir.1999). In other words, the analysis starts with the question whether the alleged restraint on Downing's free exercise and free speech rights was permissible

### (i) *Free Speech*

In *Marchi*, the Second Circuit noted the difficulty government agencies face when an employee's conduct presents a potential violation of the Establishment Clause, but restricting that conduct presents a potential violation of the Free Exercise Clause. *Id.* at 475–76. Like the present case, *Marchi* "concern[ed] the tension between two constitutional principles—separation of church and state and the free exercise of religion—in the context of public education." *Id.* at 472.

Marchi was a certified special education teacher who taught socially and emotionally disturbed high school students for the Board of Cooperative Educational Services of Albany ("BOCES"). *Id.* Marchi underwent a dramatic conversion to Christianity and not only shared this experience with his students but modified his instructional program to discuss such topics as forgiveness, reconciliation, and God. *Id.*

BOCES issued a "cease and desist" letter, directing Marchi to refrain from using any religious references as part of his "instructional program." Marchi refused to abide by the directive and was suspended for six months. Marchi was allowed to return to teaching after making a commitment, in a written affirmation, to adhere to the directive.

Shortly after his return to work, a teacher's aide saw a letter from Marchi to the parent of one of Marchi's students. The parent had sent an audiotape of religious music to school in his son's lunch box, along with a note stating that the music calmed his son. In response, Marchi wrote:

> Ryan had a good day today. I thank you and the LORD for the tape[;] it brings the Spirit of Peace to the classroom. Tomorrow is a teacher's conference and dismissal is at 11:30. May God Bless you all richly!

*Id.* at 473.

After learning of the letter, Marchi's supervisor met with him. Marchi indicated that, because the letter was written to a parent, he did not consider it to be part of his "instructional program," and therefore regarded it as outside the directive's reach. In a written response, BOCES informed Marchi: "since you communicated these messages in your capacity as a BOCES teacher, and in as much as parents are part of the instructional process, [our] interpretation of the agreement you signed . . . precludes you from communicating in this manner." *Id.*

Marchi filed a section 1983 action, alleging that: (1) BOCES violated his rights to academic freedom, free association, free speech, and free exercise of religion, as

---

defendant. In any event, because the court concludes that the actions taken by the defendants did not violate any of Downing's

rights—or, even if they did, that the defendants are entitled to qualified immunity—it need not address this issue.

well as his rights under the Religious Freedom Restoration Act, by suspending him in 1995; (2) BOCES violated his right to due process and retaliated against him by assigning him to teach a different type of class upon his return to teaching; (3) the directive was unconstitutionally vague and overbroad; and (4) the directive had been applied to proscribe protected speech between Marchi and students' parents.

The District Court granted BOCES's motion for summary judgment. On appeal, the Second Circuit stated:

> The directive is unquestionably a restraint on Marchi's First Amendment rights. *However, not all restraints on free exercise and free speech rights are invalid.* Frequently, the validity of a particular restraint depends on the context in which the expression occurs. And, as the Supreme Court has repeatedly emphasized, the special nature of public educational institutions gives rise to "the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 507, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (citations omitted). Of particular relevance to this appeal, the Court has noted that *"the interest of the State in avoiding an Establishment Clause violation 'may be [a] compelling' one justifying an abridgement of free speech otherwise protected by the First Amendment."* *Lamb's Chapel v. Center Moriches Union Free School District,* 508 U.S. 384, 394, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993) (quoting *Widmar v. Vincent,* 454 U.S. 263, 271, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981)).

*Marchi,* 173 F.3d at 475 (emphasis added).

Reviewing Establishment Clause jurisprudence, the Second Circuit noted that courts have not only struck down school-sponsored religious activities and official endorsement of religion, but have also held that public school officials have the authority to prevent teachers from giving students and others the impression that the school prefers a particular religion, or religion in general. *Id.* (collecting cases). "Thus, schools may direct teachers to refrain from expression of religious viewpoints in the classroom and like settings; indeed, schools have a constitutional duty to make certain that subsidized teachers do not inculcate religion." *Id.* (citing *Bishop v. Aronov,* 926 F.2d 1066, 1077 (11th Cir.1991), and *Lemon v. Kurtzman,* 403 U.S. 602, 619, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971)) (internal quotation marks omitted).

Significantly, in light of the Supreme Court's establishment-of-religion and free-exercise jurisprudence, the Court stated:

> [W]hen government endeavors to police itself and its employees in an effort to avoid transgressing Establishment Clause limits, it must be accorded some leeway, even though the conduct it forbids might not inevitably be determined to violate the Establishment Clause and the limitations it imposes might restrict an individual's conduct that might well be protected by the Free Exercise Clause if the individual were not acting as an agent of government.

*Id.* at 476 (emphasis added). The Court explained:

> The decisions governmental agencies make in determining when they are at risk of Establishment Clause violations are difficult, and, in dealing with their employees, they cannot be expected to resolve so precisely the inevitable tensions between the Establishment Clause and the Free Exercise Clause that they

may forbid only employee conduct that, if occurring, would violate the Establishment Clause and must tolerate all employee conduct that, if prohibited as to non-employees, would violate the Free Exercise Clause. When government is both the initiator of some religiously related actions, through the conduct of its employees, and the regulator of the extent of such actions, through the conduct of its supervising employees, it need not determine, at the peril of legal liability, precisely where the line would be drawn if its employees were not involved. Though school boards, like all instrumentalities of government, must observe the basic free exercise rights of its employees, the scope of the employees' rights must sometimes yield to the legitimate interest of the governmental employer in avoiding litigation by those contending that an employee's desire to exercise his freedom of religion has propelled his employer into an Establishment Clause violation. In discharging its public functions, the governmental employer must be accorded some breathing space to regulate in this difficult context. For his part, the employee must accept that he does not retain the full extent of free exercise rights that he would enjoy as a private citizen.

*Id.* at 476; *see also Bishop,* 926 F.2d at 1069 (referring to "the first amendment tight rope upon which the University found itself perched. Without unnecessarily restricting the academic freedom of a faculty member, the University endeavored to avoid Establishment Clause violations and undue pressure upon students.").

Guided by these principles, the Second Circuit found that BOCES' conduct did not impermissibly infringe Marchi's rights. *Id.* at 477. The Court reasoned:

> Because BOCES has a strong, perhaps compelling, interest in avoiding Establishment Clause violations, *see Lamb's Chapel,* 508 U.S. at 394, 113 S.Ct. 2141, 124 L.Ed.2d 352, it may proscribe interactions between teachers and parents that risk giving the impression that the school endorses religion. A school risks violation of the Establishment Clause if any of its teachers' activities gives the impression that the school endorses religion.
>
> . . . . .
>
> Though Marchi's letter was slight in its references to religion, it sufficiently intruded religious content into a curricular matter, not involving a course in religion, such that the school authorities could reasonably be concerned that communications of this sort would expose it to non-frivolous Establishment Clause challenges.

*Marchi,* 173 F.3d at 476–77. Accordingly, the Second Circuit affirmed the district court's dismissal of Marchi's claim. *Id.* at 477.

▮▮▮ In light of *Marchi,* the defendants are entitled to summary judgment on the free speech claim because their conduct did not impermissibly infringe Downing's free speech rights. Because the West Haven Board "has a strong, perhaps compelling interest in avoiding Establishment Clause violations, it may proscribe interactions . . . that risk giving the impression that the school endorses religion." *Marchi,* 173 F.3d at 477, (citing *Lamb's Chapel,* 508 U.S. at 394, 113 S.Ct. 2141). "A school risks violation of the Establishment Clause if any of its teachers' activities gives the impression that the school endorses religion." *Id.* For the defendants to have permitted Downing to wear a shirt during classroom instruction that was emblazoned with the words "JESUS 2000—J2K" would likely have violated the Establishment Clause of the First Amendment. Such speech does not have a

secular purpose, would have the primary effect of advancing religion, and would have entangled the school with religion. Moreover, a public school teacher's shirt prominently bearing the words "JESUS 2000—J2K" can be reasonably viewed as a governmental endorsement of religion. As the Second Circuit has noted:

> While at the high school, whether he is in the classroom or outside of it during contract time, [a public school teacher] is not just any ordinary citizen. He is a teacher .... He is clothed with the mantle of one who imparts knowledge and wisdom. His expressions of opinion are all the more believable because he is a teacher. The likelihood of high school students equating his views with those of the school is substantial.

*Id.* (quoting *Peloza v. Capistrano Unified School District,* 37 F.3d 517, 522 (9th Cir. 1994)).

In any event, even if Downing's shirt would not have violated the Establishment Clause, the defendants' proscriptive conduct may still pass constitutional muster:

> When government endeavors to police itself and its employees in an effort to avoid transgressing Establishment Clause limits, it must be accorded some leeway, *even though the conduct it forbids might not inevitably be determined to violate the Establishment Clause and the limitations it imposes might restrict an individual's conduct that might well be protected by the Free Exercise Clause if the individual were not acting as an agent of government.*

*Marchi,* 173 F.3d at 476 (emphasis added).

In short, whatever First Amendment rights were implicated by Downing wearing her tee shirt [5] must give way to the

defendants' legitimate concerns about a potential Establishment Clause violation in a public school. *See Marchi,* 173 F.3d at 476 ("the scope of the employees' rights must sometimes yield to the legitimate interest of the governmental employer in avoiding litigation by those contending that an employee's desire to exercise his freedom of religion has propelled his employer into an Establishment Clause violation."). The defendants' restraint on Downing's free speech rights was constitutionally permissible and the defendants are entitled to summary judgment on that claim. *See id.* at 475–76; *see also Helland v. South Bend Community School Corp.,* 93 F.3d 327, 331 (7th Cir.1996) (removal of teacher from list of substitutes for improperly interjecting religion into his classes was "not only permissible, but ... tolerating [his] behavior would have opened up another constitutional can of worms."); *Peloza v. Capistrano Unified School District,* 37 F.3d 517 (9th Cir.1994) (school district's ordering public high school biology teacher to refrain from discussing his religious beliefs regarding evolution and creation during instructional time constitutionally permissible *Roberts v. Madigan,* 921 F.2d 1047, 1056–58 (10th Cir.1990) (teacher could be prohibited from reading Bible during silent reading period, and from stocking two books on Christianity on shelves, because those items could leave students with the impression that Christianity was officially sanctioned)), *cert. denied,* 505 U.S. 1218, 112 S.Ct. 3025, 120 L.Ed.2d 896 (1992).

#### (ii) *Free Exercise of Religion*

█ The rationale of *Marchi* applies with equal force to any claim by the plaintiff that the defendants' conduct violated

---

5. As discussed in the following section, wearing the tee shirt was not an exercise of Downing's religion. Rather, it was a communica-

tion of her religious views. Accordingly, the defendants' concerns about violating the Establishment Clause carry greater weight.

her right to the free exercise of her religion. *See, e.g., Marchi*, 173 F.3d at 477 (conduct did not impermissibly infringe Marchi's "free exercise rights").

In addition, the defendants are entitled to summary judgment on this claim because Downing has raised no genuine issue of material fact that any of the purportedly unlawful conduct actually impeded her practice of her religion. Indeed, Downing admitted in her deposition that the defendants conduct never, in any way, hindered her ability to practice her religion. *See* Transcript of Deposition of Ella Downing dated July 21, 2000 at 41–42. Accordingly, for this additional reason, summary judgment is appropriate on Downing's free exercise claim. *See, e.g., Bishop v. Aronov*, 926 F.2d 1066, 1077 (11th Cir.1991) (affirming dismissal of free exercise claim because plaintiff failed to demonstrate that restrictions impeded the practice of his religion or his right to free exercise of worship as those concepts are comprehended in constitutional parlance; the university's restrictions were not directed at his efforts to practice religion, but were directed at his practice of teaching).

(iii) *Unlawful Retaliation*

■ The defendants are also entitled to summary judgment on Downing's section 1983 retaliation claim. To establish a prima facie case of unlawful retaliation a plaintiff must demonstrate: (1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action. *See, e.g., Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir.2000); *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1308 (1995); *see also Gierlinger v. Gleason*, 160 F.3d 858, 872 (2d Cir.1998); *Beattie v. Farnsworth Middle School*, No. 98–CV–

0399 (LEK)(DRH), 1998 WL 1769747 at *10 (N.D.N.Y. Dec. 8, 1999).

■ Downing was not subjected to an adverse employment action either simultaneous with or subsequent to the protected activity. The only adverse employment action Downing has identified was the defendants' contemporaneous act of requiring her to either cover up her shirt or to go home and change. *See* Transcript of Deposition of Ella Downing dated July 21, 2000 at 50–52. Although Downing felt "disciplined" by the defendants' reaction to her shirt, there is no evidence to suggest an adverse employment action as that concept is defined by the law—such as an express or constructive discharge or demotion; a failure to promote; a reprimand or warning; a reference in a personnel file, or the like. Moreover, there is no evidence to suggest that the defendants took any employment action against Downing subsequent to and arising from the protected activity. Rather, this was a single incident and Downing suffered no later discipline. Because retaliation requires either a contemporaneous or subsequent adverse impact from the claimed exercise of constitutional rights, the circumstances here are simply not sufficient to sustain a claim for unlawful retaliation and the defendants are entitled to summary judgment as a matter of law.

(iv) *Qualified Immunity*

■ A government official is entitled to qualified immunity from suit for actions taken as a government official if: (1) the conduct attributed to the official is not prohibited by federal law, constitutional or otherwise; (2) the plaintiff's right not to be subjected to such conduct by the official was not clearly established at the time of the conduct; or (3) the official's action was objectively legally reasonable in light of the legal rules that were clearly estab-

lished at the time it was taken. *See Cuoco v. Moritsugu,* 222 F.3d 99, 109 (2d Cir. 2000). "Ordinarily, these issues should be approached in sequence, for if the second is resolved favorably to the official, the third becomes moot; a favorable resolution of the first moots both the second and the third." *Rohman v. New York City Transit Auth.,* 215 F.3d 208, 214–15 (2d Cir. 2000).

■ For the reasons discussed above, the conduct attributed to the defendants is not prohibited by federal law, constitutional or otherwise. Even assuming that the defendants violated any of Downing's rights under the federal constitution, however, the defendants would nevertheless be entitled to qualified immunity because the defendants' conduct was objectively reasonable in light of clearly established law at the time. Upon learning of the situation, Taylor contacted Frattini, the Assistant Superintendent of the West Haven Public Schools, who in turn consulted the attorneys who represent the West Haven Board of Education. Acting on the advice of counsel, Taylor instructed Downing to either cover the tee shirt or go home and change into other clothes. Based upon the existing law discussed above, it was objectively reasonable for the defendants to believe that their conduct would not violate

Downing's First Amendment rights—particularly in light of their strong, perhaps compelling, interest in avoiding an Establishment Clause violation. As the Second Circuit has stated, "[t]he decision governmental agencies make in determining when they are at risk of Establishment Clause violations are difficult and, in dealing with their employees, they cannot be expected to resolve so precisely the inevitable tensions between the Establishment Clause and the Free Exercise Clause . . . ." *Marchi,* 173 F.3d at 476.

In short, even assuming that the defendants violated any of Downing's rights under the federal constitution, the defendants are entitled to qualified immunity and, for that additional reason, summary judgment will enter in their favor on Downing's section 1983 claims arising under the federal constitution.[6]

## C. *Claims under the Connecticut Constitution*

Although the plaintiff enjoys broader free speech rights under the Connecticut Constitution than under the United States Constitution *see State v. Linares,* 232 Conn. 345, 378–86, 655 A.2d 737 (1995), the court is not persuaded that the result is

---

**6.** The federal qualified immunity defense arising under *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), and its progeny is not applicable to Downing's claims arising under the Connecticut Constitution. "The *Harlow* qualified immunity defense is limited to claimed violations of federal law, whether based on the federal constitution, federal statute, or federal treaties. It does not, however, pertain to state law claims. Pendent, or as they are now called, supplemental, state law claims are governed by state immunity law. Applying federal qualified immunity standards governing § 1983 and *Bivens*-type claims to pendent state law claims would obviously constitute an unwarranted interfere by the federal

courts with substantive state law." 1B Martin A. Schwartz and John E. Kirklin, *Section 1983 Litigation: Claims and Defenses* § 9.14 at 343 (3d ed.1997) (citations omitted); *see also Mulligan v. Rioux,* 229 Conn. 716, 728–730, 643 A.2d 1226 (1994) ("The standard of qualified immunity that protects public officials from civil suits pursuant to § 1983, arising from the performance of their discretionary functions, is distinct from that established under our common law." The trial court erred because it "neither considered nor cited any state cases. Rather, the trial court relied solely on federal cases and discussed the defense of qualified immunity strictly in the context of a § 1983 claim.").

any different under the Connecticut Constitution.

Neither the Connecticut Supreme Court nor the Connecticut Appellate Court have addressed the tension between the principles of separation of church and state and free speech under the Connecticut Constitution.

In *Linares*, however, the ·Connecticut Supreme Court adopted the "compatibility test" expressed in *Grayned v. Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972), for claims brought under the Connecticut Constitution involving restrictions on speech on public property *Linares*, 232 Conn. at 379, 655 A.2d 737; *see also id.* at 384, 655 A.2d 737 ("adoption of the *Grayned* approach will best protect free speech under our state constitution."). That test "require[s] a case-by-case balancing of the right to free speech against the competing interest of preventing unreasonable interference with the 'normal activity' of a particular place." *Id.* at 382, 655 A.2d 737. The Court stated:

> The *Grayned* test requires the government, under the Connecticut constitution, to permit free speech and public expression on government property up to the point when such free expression becomes "basically incompatible with the normal activity of a particular place at a particular time .... [I]n assessing the reasonableness of a regulation, [a court weighs] heavily the fact that communication is involved; the regulation must be narrowly tailored to further the State's legitimate interest."

*Id.* at 386–87, 655 A.2d 737 (quoting *Grayned*, 408 U.S. at 116–17, 92 S.Ct. 2294).

Along with broader free speech protection, the Connecticut Constitution also provides for broader separation between church and state. In *Linares*, the Court noted that:

> in the years immediately preceding our constitution's enactment, Connecticut citizens embraced a philosophy of greater tolerance, moving toward a more culturally diverse society. This [was] particularly evident in the struggle to separate church and state. Between 1812 and 1818, the issue of church and state deeply divided political factions. The Federalists continued to support established institutions both religious and secular. At the same time, the Tolerationists strongly advocated the separation of church and state and, as their party name suggests, a movement towards greater tolerance.

*Linares*, 232 Conn. at 385, 655 A.2d 737 (citations omitted). The Tolerationists ultimately prevailed and their views "culminated in the enactment of the Connecticut constitution." *Id.* The Court was "convinced, therefore, that our constitution's speech provisions reflect a unique historical experience and a move toward enhanced civil liberties, particularly those liberties designed to foster individuality." *Id.*

The Connecticut Supreme Court has also noted the Connecticut Constitution's broader separation between church and state in more express terms. The Court pointed out in *Griswold Inn v. Connecticut*, 183 Conn. 552, 441 A.2d 16 (1981), that the first amendment to the United States Constitution and article seventh of the Connecticut Constitution serve a similar purpose. *Id.* at 558–59, 441 A.2d 16; *see also Board of Education of the Town of Stafford v. State Board of Education*, 243 Conn. 772, 785–86, 709 A.2d 510 (1998). At the same time, the Court recognized that "[t]he state provision is ... more comprehensive than the federal provision." *Id.* at 559 n. 3, 441 A.2d 16. The Court further noted that "[a]rticle seventh's language even more than the federal provi-

sion condemns any law which gives 'preference' to one religious society and assures that no person 'shall ... be compelled to ... support ... or be associated with' any religious group but can 'worship in a mode consistent with the dictates of their consciences.'" *Id.* Thus, the language of article seventh of the Connecticut Constitution demonstrates an intent to more positively enunciate the separation between church and state. *See also Board of Education of the Town of Stafford*, 243 Conn. at 794, 709 A.2d 510 (Berdon, J., dissenting).

■ In light of these principles, the court is persuaded that the basic rationale set forth in *Marchi* under the United States Constitution applies with equal force when analyzing claims under article seventh of the Connecticut Constitution. Under the Connecticut Constitution, the defendants must respect Downing's free speech and public expression rights up to the point where such free expression becomes incompatible with the normal activity of a particular place at a particular time. Moreover, any restriction on Downing's conduct must be narrowly tailored to further the State's legitimate interest.

■ The defendants did not run afoul of these principles. Downing's wearing the "JESUS 2000—J2K" tee shirt during classroom instructional time was incompatible with the normal activity of the school because it placed the defendants in the position of potentially violating the principles of separation between church and state. The West Haven Board has a strong, perhaps compelling, interest in avoiding such a violation and may therefore proscribe interactions that risk giving the impression that the school endorses religion. *See, e.g., Lamb's Chapel,* 508 U.S. at 394, 113 S.Ct. 2141.

Moreover, the defendants' actions were narrowly tailored to meet their interest in avoiding such a violation. Downing suf-

fered no adverse employment action and was not subject to any later discipline. The defendants simply asked Downing to either cover the tee shirt or go home and change. Moreover, Downing only had to cover the tee shirt during her instructional time. Indeed, it is undisputed that Taylor gave Downing permission to remove the lab coat during her last period of the day, a free period. *See* Transcript of Deposition of Ella Downing dated July 21, 2000 at 27, lines 3–15. In short, Downing's wearing a tee shirt bearing the words "JESUS 2000—J2K" was incompatible with the defendants' legitimate interest in avoiding a violation of the separation of church and state and the defendants' response to the situation was narrowly tailored to further that interest. Accordingly, any infringement of Downing's rights under the Connecticut Constitution was permissible and the defendants are entitled to summary judgment on that claim as well.

D. *Count II -Violation of Conn. Gen. Stat. § 31–51q*

In Count Two Downing alleges that the defendants' conduct violated Conn. Gen. Stat. § 31–51q. Section 31–51q provides, in pertinent part:

Any employer ... who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer, shall be liable to such employee for damages caused by such discipline or discharge, including punitive damages, and for reasonable attorney's fees

as part of the costs of any such action for damages . . . .

Conn. Gen.Stat. § 31–51q.[7]

■ To assert a valid claim under section 31–51q, the plaintiff must show: (1) that she engaged in protected speech, (2) that she was disciplined or fired because of that speech, and (3) that such speech did not substantially or materially interfere with her bona fide job performance or with her working relationship with her employer. *Lowe v. Amerigas, Inc.*, 52 F.Supp.2d 349, 359 (D.Conn.1999) (citing *Winik–Nystrup v. Manufacturers Life Ins. Co.*, 8 F.Supp.2d 157, 159 (D.Conn.1998); *Williams v. Bayer Corp.*, 982 F.Supp. 120, 123 (D.Conn.1997)).

■ Downing's claim under section 31–51q is similar to her retaliation claim under section 1983 and consideration of this count is guided by the court's analysis of the section 1983 retaliation claim. *See Ritz v. Town of East Hartford*, 110 F.Supp.2d 94, 103 (D.Conn.2000) (disposition of claim arising under section 31–51q controlled by disposition of First Amendment retaliation claim under section 1983).

As with her section 1983 claim of First Amendment retaliation, Downing's section 31–51q claim also fails because she has not proffered evidence that she suffered an adverse employment action. As discussed above, the only "discipline" Downing identified was the defendants' act of requiring her to either cover up her shirt or to go home and change. *See* Transcript of Deposition of Ella Downing dated July 21, 2000 at 50–52. There is simply no evidence that Downing was given any form of discipline as that concept is understood in the context of employment law. Accordingly, the defendants are entitled to sum-

mary judgment as a matter of law on Count Two.

E. *Count III -Intentional Infliction of Emotional Distress*

In Count Three, Downing asserts a claim against the defendants for intentional infliction of emotional distress.

■ To establish a claim for intentional infliction of emotional distress, Downing must show: "(1) that the actor intended to inflict emotional distress; or that he knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress and (4) that the emotional distress sustained by the plaintiff was severe." *Petyan v. Ellis*, 200 Conn. 243, 253, 510 A.2d 1337 (1986) (internal citations omitted).

■ Liability for intentional infliction of emotional distress requires conduct that is so extreme and outrageous that it goes beyond all possible bounds of decency, is regarded as atrocious, is utterly intolerable in a civilized society, and is of a nature that is especially calculated to cause, and does cause, mental distress of a very serious kind. *See Taylor v. Maxxim Medical, Inc.*, No. 3:99CV338(AHN), 2000 WL 630918 at *3 (D.Conn.2000); *Rapkin v. Rocque*, 97 F.Supp.2d 244 (D.Conn.2000) (*citing Petyan*, 200 Conn. at 254 n. 5, 510 A.2d 1337; *DeLaurentis v. New Haven*, 220 Conn. 225, 266–67, 597 A.2d 807 (1991)); *see also* 1 Restatement (Second), Torts § 46, comment (d) (1965). Thus, "[i]t is the intent to cause injury that is the gravamen of the tort." *DeLaurentis*, 220 Conn. at 266–67, 597 A.2d 807. Under Connecticut law, the court makes the ini-

---

7. Sections 3, 4, and 14 of Article I of the Connecticut Constitution mirror the first amendment to the federal Constitution in that both protect religious liberty, freedom of speech, and the right to assemble and petition, respectively.

tial determination whether the defendants' alleged conduct rises to the level of extreme and outrageous. *Dobrich v. General Dynamics Corp.*, 40 F.Supp.2d 90, 104–05 (D.Conn.1999); *Rapkin*, 97 F.Supp.2d at 246 (citing *Johnson v. Chesebrough–Pond's USA Co.*, 918 F.Supp. 543, 552 (D.Conn.1996), *aff'd*, 104 F.3d 355 (2d Cir.1996)); *Bell v. Board of Educ. of West Haven*, 55 Conn.App. 400, 408, 739 A.2d 321 (1999). "Only where reasonable minds can differ does it become an issue for the jury." *Bell*, 55 Conn.App. at 408, 739 A.2d 321 (citing *Reed v. Signode Corporation*, 652 F.Supp. 129, 137 (D.Conn.1986); 1 Restatement (Second), Torts § 46, cmt. (h) and (j)); *Mellaly v. Eastman Kodak Co.*, 42 Conn.Supp. 17, 18–19, 597 A.2d 846, (1991).

 Applying these standards to the present case, the court holds that the defendants' conduct was not so outrageous and extreme as to be regarded as atrocious and utterly intolerable in a civilized society. Downing bases her claim of intentional infliction of emotional distress against the defendants largely on the same facts underlying her constitutional claims. Specifically, Downing identifies the following conduct as extreme and outrageous: (1) the defendants' requiring her to change or cover the tee shirt; (2) Taylor's "pounding" on Downing's classroom door to get her attention; and (3) Taylor's contacting the assistant superintendent before coming to see her first. *See* Transcript of Deposition of Ella Downing dated July 21, 2000 at 52–56. No reasonable juror could conclude that the defendants' conduct was atrocious and exceeded all bounds usually tolerated by decent society. Connecticut courts have consistently held that indignities, annoyances, petty oppressions or conduct that displays bad manners or results in hurt feelings do not support a claim for intentional infliction of emotional distress.

*See, e.g., Miner v. Town of Cheshire*, 126 F.Supp.2d 184, 195 (D.Conn.2000); *Taylor*, 2000 WL 630918 at *3 (citing *Kintner v. Nidec–Torin Corp.*, 662 F.Supp. 112, 114 (D.Conn.1987); *Reed*, 652 F.Supp. at 137); *Ferraro v. Stop & Shop Supermarket Co.*, 2000 WL 768525 at *4 (Conn.Super.2000).

As a matter of law, Downing has failed to proffer evidence from which a reasonable jury would be permitted to infer that the defendants' conduct was sufficiently extreme or outrageous to support a claim for intentional infliction of emotional distress. Accordingly, summary judgment is granted in favor of the defendants on Count Three.

### F. *Count IV -Negligent Infliction of Emotional Distress*

Similarly, the defendants are entitled to summary judgment on Count Four. Although there is some doubt whether a claim for negligent infliction of emotional distress exists under Connecticut law for acts in the employment context and whether the Connecticut Supreme Court would limit negligent infliction of emotional distress claims to conduct at the time of termination, *see Malik v. Carrier Corp.*, 202 F.3d 97, 103–04 & n. 1 (2d Cir.2000), the court need not address those issues. To state a claim, the plaintiff must still adduce sufficient facts showing that the defendants should have recognized that their conduct involved an unreasonable risk of causing distress.

 To prevail on a claim for negligent infliction of emotional distress, the plaintiff must prove that "the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or bodily harm." *Ancona v. Manafort Brothers, Inc.*, 56 Conn.App. 701, 713, 746 A.2d 184 (Conn.App.2000), (citing *Pavliscak v.*

*Bridgeport Hospital,* 48 Conn.App. 580, 597, 711 A.2d 747, *cert. denied,* 245 Conn. 911, 718 A.2d 17 (1998)); *Morris v. Hartford Courant Company,* 200 Conn. 676, 683, 513 A.2d 66 (1986); *Montinieri v. Southern New England Telephone Co.,* 175 Conn. 337, 345, 398 A.2d 1180 (1978); *see also Miner,* 126 F.Supp.2d at 196–99. The Connecticut Supreme Court "has consistently held that a defendant is not liable for emotional distress unless the defendant or its agents or servants, should have realized that its conduct involved an unreasonable risk of causing the distress, and from the facts known to it, its agents should have realized that the distress, if it were caused, might result in illness or bodily harm." *Chieffalo v. Norden Systems, Inc.,* 49 Conn.App. 474, 479–80, 714 A.2d 1261 (1998), *citing Montinieri,* 175 Conn. at 345–46, 398 A.2d 1180. This

> essentially requires that the fear or distress experienced by the plaintiffs be reasonable in light of the conduct of the defendants. If such a fear were reasonable in light of the defendants' conduct, the defendants should have realized that their conduct created an unreasonable risk of causing distress, and they, therefore, properly would be held liable. Conversely, if the fear were unreasonable in light of the defendants' conduct, the defendants would not have recognized that their conduct could cause this distress and, therefore, they would not be liable.

*Chieffalo,* 49 Conn.App. at 479–80, 714 A.2d 1261, *citing Barrett v. Danbury Hospital,* 232 Conn. 242, 261–62, 654 A.2d 748 (1995).

■ From the evidence presented, no reasonable jury could find that the defendants' response to Downing's tee shirt was handled in such a manner that the defendants knew or should have known that their conduct involved an unreasonable risk of causing emotional distress that might result in illness or bodily harm. *See, e.g., Chieffalo,* 49 Conn.App. at 480–81, 714 A.2d 1261 ("no evidence to prove that the defendant or its agents knew or should have known that their conduct ... involved an unreasonable risk of causing emotional distress that might result in illness or bodily harm;") *see also Morris,* 200 Conn. 676, 513 A.2d 66 (affirming dismissal of negligent infliction of emotional distress claim that failed to allege foreseeable injury), *Pavliscak,* 48 Conn.App. at 597, 711 A.2d 747 ("plaintiff must prove that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or bodily harm."); *Hernandez v. City of Hartford,* 30 F.Supp.2d 268, 274 (D.Conn.1998) ("it was not reasonable for defendant to foresee that its handling of a personnel matter such as this ... would involve an unreasonable risk of causing mental distress to plaintiff that might result in serious illness or bodily harm."). Summary judgment is therefore granted in favor of the defendants on Count Four.

## IV. *CONCLUSION*

For the foregoing reasons, the defendants' Motion for Summary Judgment (doc. # 22) is GRANTED. The clerk is instructed to close the file.

It is so ordered.